IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
May 7, 2008 Session

## STATE OF TENNESSEE v. ARIEL BEN SHERMAN

**Appeal by permission from the Court of Criminal Appeals**
**Criminal Court for Loudon County**
**No. 10,611A      E. Eugene Eblen, Judge**

---

**No. E2006-01226-SC-R11-CD - Filed August 15, 2008**

---

A Loudon County grand jury indicted the defendant, Ariel Ben Sherman, and co-defendant, Jacqueline Crank, for child neglect. The trial court dismissed the indictment against Sherman. The Court of Criminal Appeals reversed and remanded. We granted Sherman's application for permission to appeal to consider the issues presented for review, and hold as follows: (1) When deciding a motion to dismiss an indictment, a trial court may consider undisputed facts that are clearly and unequivocally agreed upon by the parties; (2) a person standing in loco parentis to a child may have a legal duty of care, the breach of which may result in criminal culpability; and (3) the State is not bound at the outset of a trial by the legal theories espoused in its bill of particulars. Because the trial court erroneously dismissed the indictment, we affirm the Court of Criminal Appeals, reinstate the indictment against Sherman, and remand the case for further proceedings consistent with this opinion.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Affirmed**

GARY R. WADE, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and JANICE M. HOLDER, CORNELIA A. CLARK, and WILLIAM C. KOCH, JR., JJ., joined.

Donald A. Bosch and Ann C. Short-Bowers, Knoxville, Tennessee, for the appellant, Ariel Ben Sherman.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael E. Moore, Solicitor General; Elizabeth T. Ryan, Senior Counsel; and Russell Johnson, District Attorney General, for the appellee, State of Tennessee.

## OPINION

## Facts and Procedural History[1]

Ariel Ben Sherman ("Defendant") moved to Lenoir City, Tennessee, in April of 2001, rented a house, and began to conduct religious services in the name of the Universal Life Church. He permitted eight of his parishioners to move into his six-bedroom residence, including Jacqueline Crank ("Crank"), her daughter Jessica Crank ("Jessica"), and her son Israel.[2]

In February of 2002, when Jessica was fourteen, Crank made an appointment with a chiropractor for an examination of Jessica's enlarged right shoulder. The Defendant was present. The chiropractor treated Jessica and scheduled a follow-up appointment. One week later, he apparently expressed concern about her condition and recommended that Jessica be examined at the University of Tennessee Medical Center. Jessica did not go to the hospital, and, instead, she was taken to Physician's Care, a walk-in clinic. While there, she was not treated by a specialist. According to the Defendant, Crank did not have adequate health insurance to pay for Jessica's medical care, and, in consequence, the church initiated an effort to raise the funds necessary to pay for future tests on her shoulder. In September of 2002, however, Jessica died of Ewing's Sarcoma, a type of bone cancer most commonly found in young people under twenty years of age.[3]

A grand jury indicted both the Defendant and Crank on one count of misdemeanor child abuse and child neglect, Tennessee Code Annotated section 39-15-401 (2003),[4] charging that the two had knowingly treated Jessica "in such a manner as to inflict injury or neglect . . . so as to adversely affect the child's health and welfare." Later, in a bill of particulars, the State made the following allegations:

---

[1] Because the trial court dismissed the indictment against the Defendant prior to trial, no proof was presented. The factual record on appeal is limited. Our factual summary has been developed from pretrial motions and other documentation filed by the State and from the transcript of the hearing on the motion to dismiss. Our recitation of the facts is for contextual purposes only.

[2] Jessica's father died in 1995.

[3] According to Dr. Ludwig G. Strauss, the frequency of Ewing's sarcoma in the United States is at a rate of 0.3 cases per 1,000,000 children under 3 years old, and 4.6 cases per 1,000,000 in adolescents 15-19 years old. See Ludwig G. Strauss, M.D., Ewing Sarcoma, EMedicine, Nov. 2, 2007, http://www.emedicine.com/radio/topic275.htm. According to the European Intergroup Cooperative Ewing's Sarcoma Study, "The 3-year, event-free survival rate was 66% in patients with localized tumors, 43% in those with lung metastases at the initial diagnosis, and 29% in those with other metastases. A large tumor volume and/or a tumor primarily localized to the pelvic area were negative prognostic factors." Id. (citing M. Paulussen et al., 211(4) Klinische Padiatrie 276 (1999)). Typically, treatment consists of chemotherapy followed by excision. It may also include radiotherapy. Complete excision may be performed immediately after the biopsy if malignancy is confirmed at that time. The lengths of treatment vary depending on location of the tumor and the stage of the disease. Most patients receive chemotherapy for 6-12 months and radiation therapy for 5-8 weeks. See Meredith Lahl et al., 12(1) Clinical J. of Oncology Nursing 89 (2008).

[4] We cite to the 2003 version of the statute because the 2003 edition was in effect at the time the alleged crime occurred.

The actions that the State allege constitute the offense in question are the failure by either defendant to pursue the medical evaluations and treatments recommended by the Chiropractor and the persons at Physician's Care. The specifics of these recommendations include dates, times, and places [and] are of course in the materials that you will be reviewing as part of open file discovery. There is obviously no dispute but that defendant Crank stood in a parental relationship with the victim. With regard to defendant Sherman, it is the State's position that he repeatedly held himself out as her father and one of her caretakers, thereby creating a duty on his part as well.

(emphasis added). The Defendant filed a pretrial motion to dismiss, pursuant to Tennessee Rule of Criminal Procedure 12(b), as did Crank. He argued that because he had no legal or special duty to provide care for Jessica, he could not be held criminally liable for her death. Crank also filed a motion to dismiss, claiming that she had lawfully chosen "spiritual treatment as opposed to taking her child" for traditional medical services and specifically cited to Tennessee Code Annotated section 39-15-402(c), which provides, in part, as follows:

Nothing in this chapter shall be construed to mean a child is neglected, abused, or abused or neglected in an aggravated manner for the sole reason the child is being provided treatment by spiritual means through prayer alone in accordance with the tenets or practices of a recognized church or religious denomination by a duly accredited practitioner thereof in lieu of medical or surgical treatment.

Tenn. Code Ann. § 39-15-402(c) (2003).

At a hearing on the motions, the State conceded that the Defendant had no marital relationship with Crank and was neither the parental nor the legal guardian of Jessica. The trial court sustained the Defendant's motion to dismiss on the grounds that he had not married Crank. The charges against Crank were also dismissed. After an appeal by the State, the Court of Criminal Appeals reversed the order of dismissal and remanded for trial.[5] The Defendant filed a motion for permission to appeal. Tenn. R. App. P. 11. Crank did not. We granted the Defendant's application for review in order to consider the propriety of the dismissal of the indictment.

---

[5] On his direct appeal to the Court of Criminal Appeals, the Defendant also argued that the General Assembly "decriminalized" his alleged acts when, in 2005, it changed the victim's age in the child neglect statute from eighteen to thirteen. Specifically, the Defendant cited the common law rule that "a party cannot be convicted, after the law under which he may be prosecuted has been repealed, although the offense may have been committed before the repeal." Bell v. Maryland, 378 U.S. 226, 230-31 (1964). Our General Assembly, however, has enacted a savings statute, which provides that when a penal statute has been repealed, any offense committed "while such statute or act was in full force and effect shall be prosecuted under the act or statute in effect at the time of the commission of the offense." Tenn. Code Ann. § 39-11-112 (2006). Our intermediate court concluded that the savings statute effectively abrogated the common law rule, and the Defendant was, therefore, subject to prosecution under the child neglect statute that was in effect at the time the alleged acts were committed. State v. Sherman, No. E2006-01226-CCA-R3-CD, 2007 WL 2011032 (Tenn. Crim. App. July 12, 2007). That issue is not before this Court.

3

**Scope of Review**

The trial court dismissed the indictment based upon the application of law to facts not in dispute. The Court of Criminal Appeals applied a de novo standard of review. Because the question presented is one of law, our review is "de novo with no presumption of correctness" as to the conclusions reached by the trial court. State v. Thompson, 197 S.W.3d 685, 690 (Tenn. 2006).

The issues presented for review also require statutory interpretation. On appeal, those issues are considered de novo with no presumption of correctness afforded to either the trial court or intermediate court of appeals. Killingsworth v. Ted Russell Ford, Inc., 205 S.W.3d 406, 408 (Tenn. 2006). When the meaning of a statute is in question, we rely upon well-established canons of statutory construction. Penal statutes are to be construed giving fair import of their terms in a way which promotes justice and effectuates the objectives of the criminal code. Tenn. Code Ann. § 39-11-104 (2006). Our chief concern is to carry out legislative intent without broadening the statute beyond its intended scope. Houghton v. Aramark Educ. Res., Inc., 90 S.W.3d 676, 678 (Tenn. 2002). We presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing. In re C.K.G., 173 S.W.3d 714, 722 (Tenn. 2005). When a statute is clear, we simply apply the plain meaning without complicating the task. Eastman Chem. Co. v. Johnson, 151 S.W.3d 503, 507 (Tenn. 2004). When a statute is ambiguous, however, we may reference the broader statutory scheme, the history of the legislation, or other sources. Parks v. Tenn. Mun. League Risk Mgmt. Pool, 974 S.W.2d 677, 679 (Tenn. 1998). We presume the General Assembly was aware of its prior enactments at the time it passed the legislation. Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995).

**Analysis**
**I. Tennessee Rule of Criminal Procedure 12**

Prior to the Tennessee Rules of Criminal Procedure, Tennessee recognized a motion to quash and a plea in abatement as separate and distinct procedural tools to challenge an indictment. See Bonds v. State, 421 S.W.2d 87, 88 (Tenn. 1967). Each had nuanced requirements. A motion to quash could be used to attack an indictment "only where the defect appear[ed] upon the face of the [instrument]." McKeldin v. State, 516 S.W.2d 82, 83 (Tenn.1974). On the other hand, a plea in abatement was the appropriate procedure for a challenge to a facially valid indictment; under this pleading, a defendant was entitled to present extraneous evidence in support of his claims. Id.; see Pennell v. State, 125 S.W. 445 (Tenn. 1909); 1 Am. Jur. 2d Abatement, Survival, and Revival §§ 1, 47 (1994). The accused could not enter a plea in abatement after a plea of "not guilty." Mendolia v. State, 241 S.W.2d 606, 611 (Tenn. 1951).

In 1975, the General Assembly eliminated the distinction between a motion to quash and a plea in abatement by amending the Tennessee Code so as to provide for the motion to dismiss. Public Acts 1975, ch. 129, § 1. Under the amended section, the trial court could dismiss an indictment for facial invalidity or other grounds regardless of whether a guilty plea had been entered. Id. The chief requirement was that the motion "state in clear and concise terms the defects alleged."

4

Id. This all-encompassing motion to dismiss was later incorporated into Rule 12 of the Tennessee Rules of Criminal Procedure, which was modeled after the federal rule.[6] State v. Thorpe, 614 S.W.2d 60, 62-63 (Tenn. Crim. App. 1980).

## A. Undisputed Facts

The Defendant first asserts that the Court of Criminal Appeals erred by ordering the trial court to consider only "formal stipulations" in the motion to dismiss. Although we do not necessarily agree with the Defendant's interpretation of that portion of our intermediate court's opinion, we will address the issue as presented. At the pretrial hearing, the State made the following statement:

> I don't mind saying what I've told counsel, and that is that the State is not alleging, and will not attempt to prove, and as far as I know, could not prove that this defendant was ever lawfully married to the mother of this child, that he ever adopted the child, that he is the stepfather, or any way legally connected in that manner.

The trial court sustained the motion to dismiss based upon the State's concession during the hearing that the Defendant was neither a parent, a stepparent, nor a legal guardian to Jessica.

When ruling upon a motion to dismiss, a trial court may consider evidence beyond the face of the indictment. Thorpe, 614 S.W.2d at 63. This may include undisputed facts or stipulations by the parties. State v. Goodman, 90 S.W.3d 557, 561 (Tenn. 2002). The question does not hinge upon how the nature of these facts became apparent to the court but upon whether they qualify as "factual evidence of the defendant's conduct at the time of the alleged offense" or as "relevant only to the legal question presented by the defendant's motion, not to the general issue of guilt or innocence." Id. This rationale extends to concessions by parties at any hearing, so long as the facts are not clearly in dispute and properly become a part of the record. Cf. State v. Messamore, 937 S.W.2d 916, 918 (Tenn. 1996) (holding that an indictment was timely filed, despite facial deficiencies, because "the record reflects, and the defendants conceded at oral argument, that prosecution had been timely commenced in each case"). If, on the record, the State and the defense unequivocally agree to those facts, whether written or verbal, then the trial court may rely upon those stipulations as "formal enough" to serve as the basis for deciding a motion to dismiss.

## B. Standard of Review under Rule 12

Rule 12 of the Tennessee Rules of Criminal Procedure provides, in pertinent part, as follows:

> A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue.
>
> . . . .

---

[6] Rule 12 also provides the proper procedural mechanism for many other pretrial motions, such as a motion to suppress evidence, motion to dismiss for lack of subject-matter jurisdiction, and motion to dismiss for failure to file within the statute of limitations.

The court shall decide each pretrial motion before trial unless it finds good cause to defer a ruling until trial or after a verdict. The court shall not defer ruling on a pretrial motion if the deferral will adversely affect a party's right to appeal. When factual issues are involved in deciding a motion, the court shall state its essential findings on the record.

Tenn. R. Crim. P. 12(b)(1), (e) (2007). A motion to dismiss under Rule 12 allows the trial court to decide issues that are ripe for resolution without a full trial on the merits. This preliminary procedure is designed to avoid "unnecessary interruption and inefficiency" and it secures the right of the State to appeal without offending double jeopardy. Goodman, 90 S.W.3d at 561. In discussing the validity of a defense presented in a pretrial motion, the United States Supreme Court has observed that the issue is "capable of determination" under the analogous federal rule if "the facts surrounding the commission of the alleged offense would be of no assistance in determining" the issue. United States v. Covington, 395 U.S. 57, 60 (1969). Generally speaking, pre-trial motions to dismiss that are "capable of determination" involve questions of law, rather than fact. United States v. Schulman, 817 F.2d 1355, 1358 (9th Cir. 1987) ("A Rule 12 . . . motion to dismiss is appropriately granted when it is based on questions of law rather than fact."). When considering such a motion, however, the trial court may make some findings of fact, so long as it does not encroach upon the province of the jury. United States v. Jones, 542 F.2d 661, 665 (6th Cir. 1976).

Determining whether the trial court correctly dismissed the indictment under Tennessee Rule of Criminal Procedure 12 is a two-step process. First, we must determine whether the trial court based its decision upon findings of law, which would be appropriate, or findings of fact that should have been presented to a jury. United States v. Miller, 491 F.2d 638, 647 (5th Cir. 1974) ("The propriety of granting a motion to dismiss an indictment under . . . Rule 12 by pretrial motion is by-and-large contingent upon whether the infirmity in the prosecution is essentially one of law or involves determinations of fact."). Second, as to questions of law, we review the trial court's holding de novo with no presumption of correctness. Perrin v. Gaylord Entm't Co., 120 S.W.3d 823, 826 (Tenn. 2003); Ganzevoort v. Russell, 949 S.W.2d 293, 296 (Tenn. 1997).

As stated, when the trial court interprets a statute and applies it to undisputed facts, the issue is one of law. Goodman, 90 S.W.3d at 561; State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999). In this instance, the trial court granted the motion to dismiss after considering that the Defendant was neither married to Crank nor the legal guardian of her daughter Jessica. Because the State conceded those facts, the dismissal was based upon an issue of law rather than any resolution of the evidence and is subject to our de novo review.

## II. Duty under Tenn. Code Ann. § 39-15-401

At the time of Jessica's death, the legislation governing child abuse and neglect provided as follows:

(a) Any person who knowingly, other than by accidental means, treats a child under

6

eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare commits a Class A misdemeanor; provided, however, that if the abused or neglected child is six (6) years of age or less, the penalty is a Class D felony.

Tenn. Code Ann. § 39-15-401(a) (2003). This statute can be broken down into two classifications–abuse and neglect. State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). The section pertaining to neglect is composed of three essential elements: (1) a person knowingly must neglect a child; (2) the child's age must be within the applicable range set forth in the statute; and (3) the neglect must adversely affect the child's health and welfare. State v. Mateyko, 53 S.W.3d 666, 670 (Tenn. 2001); Ducker, 27 S.W.3d at 896. The first element is at issue in this case. In order to establish neglect, the State must first prove that a defendant owes a legal duty to the child. Mateyko, 53 S.W.3d at 671.

Other jurisdictions have assessed criminal liability for the failure to act on behalf of a child where the law imposes a duty to do so. See, e.g., Commonwealth v. Twitchell, 617 N.E.2d 609, 613 (Mass. 1993); State v. Stewart, 663 A.2d 912, 928-29 (R.I. 1995); State v. Eagle Hawk, 411 N.W.2d 120, 122 (S.D. 1987); see also 21 Am. Jur. 2d Criminal Law § 32 (1998). In order to be found guilty of a criminal omission, one must have knowledge of the circumstances that give rise to the duty.[7] See Westrup v. Commonwealth, 93 S.W. 646, 648 (Ky. 1906) ("One cannot be said in any manner to neglect or refuse to perform a duty unless he has knowledge of the condition of things which require performance at his hands."). Moreover, our child neglect statute contemplates that the conduct constituting the offense be made knowingly. Ducker, 27 S.W.3d at 897. A defendant's duty to act must arise from a legal duty; a mere moral obligation will not suffice.[8] See People v. Beardsley, 113 N.W. 1128, 1129 (Mich. 1907). One commentator has divided the traditional sources of legal duties in the criminal context into six categories: (1) duty based on relationship; (2) duty based on statute; (3) duty arising from contract; (3) duty arising from a voluntary assumption of care; (4) duty to control others; (5) duty arising from creation of peril; and (6) duty of landowner.[9] 1 W. LaFave & A. Scott, Substantive Criminal Law § 6.2(a) (2d ed. 2003); see also Jones v. United States, 308 F.2d 307, 310 (D.C. Cir. 1962) (recognizing four sources of duty). Ordinarily, the legal duty

---

[7] An informative article describing the development of criminal omissions from the time of Roman law to American statutory law was published in the Harvard Law Review. Otto Kirehheimer, Criminal Omissions, 55 Harv. L. Rev. 615 (1942).

[8] Some commentators have challenged this notion and suggest that the duty to act should be broader than it traditionally has been applied. See Graham Hughes, Criminal Omissions, 67 Yale L.J. 590, 624 (1958) ("In a civilized society, a man who finds himself with a helplessly ill person who has no other source of aid should be under a duty to summon help, whether the person is his wife, his mistress, a prostitute or a Chief Justice."); but see Joshua Dressler, Cases and Materials on Criminal Law 134 (3d ed. 2003) ("Traditionally, American criminal law sets only minimalist goals. It seeks to prevent people from causing positive harm to others; it does not compel individuals, upon the threat of criminal punishment, to be virtuous.").

[9] There has been some criticism of this duty-based approach. See Arthur Leavens, A Causation Approach To Criminal Omissions, 76 Calif. L. Rev. 547 (1988).

envisioned by section 39-15-401(a), along with the knowledge of such a duty, arises from a relationship with a child victim. This necessarily leads to the question of what kind of relationship gives rise to a duty under section 39-15-401(a).

Our criminal code does not include a definition for "child neglect." Further, the code does not address the requisite nature of the affiliation before the duty arises to provide medical care or treatment. In determining the legislative intent, we have previously relied upon provisions applicable to the juvenile courts and the Department of Children's Services, explaining that the "primary purpose of these statutes, like that of the criminal child abuse statute, is to prevent acts of child neglect and to protect and care for children who are victims of neglect." State v. Adams, 24 S.W.3d 289, 295 (Tenn. 2000) (citing Tenn. Code Ann. §§ 37-1-102(b)(12)(D), -102(b)(12)(F), 37-5-103(8)(D), -103(8)(F) (1996 & Supp. 1999)). A familiar canon of statutory construction is that statutes with a common purpose will use common definitions. See, e.g., Mandela v. Campbell, 978 S.W.2d 531, 534 (Tenn. 1998); Stevens v. Linton, 229 S.W.2d 510, 512 (Tenn. 1950).

In juvenile proceedings, a "dependent and neglected child" is one "[w]hose parent, guardian or custodian neglects or refuses to provide necessary medical, surgical, institutional or hospital care for such child." Tenn. Code Ann. § 37-1-102(b)(12)(D) (emphasis added). Because the State has stipulated that the Defendant was neither the parent nor legal guardian of the victim, the precise issue is whether the term "custodian" applies. A "custodian" is defined as "a person, other than a parent or legal guardian, who stands in loco parentis to the child or a person to whom temporary legal custody of the child has been given by order of a court." Tenn. Code Ann. § 37-1-102(b)(7) (2005) (emphasis added). Our Court of Appeals has ruled, "'Where one is in loco parentis the rights, duties, and liabilities of such person are the same as those of the lawful parent.'" Hollis v. Thomas, 303 S.W.2d 751, 761 (Tenn. Ct. App. 1957) (quoting 67 C.J.S. Parent and Child § 71). That assessment is consistent with the common law. Niewiadomski v. United States, 159 F.2d 683, 686 (6th Cir. 1947) ("At common law a parent is charged with the duty of educating and supporting a minor child . . . . The same rights and duties exist when the relationship of in loco parentis has been intentionally assumed and established."). We hold, therefore, that our criminal code envisions that a person standing in loco parentis to a child may be subject to criminal liability for child neglect.[10]

"In loco parentis" is, of course, Latin for "in the place of a parent." Geibe v. Geibe, 571 N.W.2d 774, 780-81 (Minn. Ct. App. 1997). The term extends as far back as Sir William

---

[10] This scope of this duty for child abuse and neglect has been applied by many of our sister states. See, e.g., Bowers v. State, 379 A.2d 748, 753 (Md. Ct. App. 1977); State v. Smith, 485 S.W.2d 461, 467 (Mo. Ct. App. 1972); People v. Pierson, 68 N.E. 243, 244 (N.Y. 1903) (finding that the duty to furnish necessities to a child applies to those considered by "the common law as the parents, guardians, or those who by adoption or otherwise have assumed the relation in loco parentis"). Contrary to our holding here today, Texas has found that only the parent of a child may be convicted of child neglect under its statute. Ronk v. State, 544 S.W.2d 123, 125 (Tex. Crim. App. 1976). The Texas Court of Criminal Appeals based its holding on statutory terminology that "[t]he only persons charged with such duty under Section 12.04 of the [Texas] Family Code are the [natural or adoptive] parents as that term is defined in Section 11.01." This differs from our statutory scheme. See Tenn. Code Ann. § 37-1-102(b)(12)(D) (stating that a neglected child is one "[w]hose parent, guardian or custodian neglects or refuses to provide necessary medical, surgical, institutional or hospital care for such child.").

Blackstone.  See 1 Commentaries *453.  Generally, someone who holds that status has assumed the traditional obligations of a parent without a formal adoption.  Niewiadomski, 159 F.2d at 686; see also 67A C.J.S. Parent and Child § 345 (2002).  Our state has long recognized the doctrine.  See, e.g., Whitworth v. Hager, 140 S.W. 205, 207 (Tenn. 1910); Norton v. Ailor, 79 Tenn. 563, 566 (1883); Maguinay v. Saudek, 37 Tenn. (5 Sneed) 146, 148 (1857).  Years ago, this Court ruled that "a tutor, teacher, or testamentary guardian, and . . . a legal substitute for a guardian" might stand in loco parentis.[11]  State v. Davidson, 184 S.W. 18, 19 (Tenn. 1916).  Further, one might be so classified for a limited time and for a limited purpose.  Phillips v. Johns, 12 Tenn. App. 354, 357 (1930) (stating that the "teacher stands in loco parentis, but to a limited extent only").  Finally, a person also may assume the full responsibilities of a parent under the doctrine.  Norton, 79 Tenn. at 566 (stating that when a stepfather admits a child into his household, he assumes "the obligation of the father as respects the support of his minor child") (citing Maguinay, 37 Tenn. at 147).[12]  When one establishes an in loco parentis relationship, that person assumes both duties and interests with regard to a child.  See Vol. State Life Ins. Co. v. Pioneer Bank, 327 S.W.2d 59, 62 (Tenn. Ct. App. 1959) (holding that someone standing in loco parentis has a sufficient interest to buy valid life insurance for a child).

Despite our long adherence to the in loco parentis doctrine, none of our rulings  address the nature of the accompanying obligations for the purposes of child neglect.  Other states have determined that the key element is one of intent–whether the adult intended to assume parental duties.  Molock v. Dorchester County Family YMCA, Inc., 779 A.2d 963, 967 (Md. Ct. Spec. App. 2001) (stating that in loco parentis is "a question of intention") (quoting Vonder Horst v. Vonder Horst, 41 A. 124, 126 (Md. 1898)); Searle v. Searle, 38 P.3d 307, 319 n.11 (Utah Ct. App. 2001) (stating that whether someone assumes obligations in loco parentis "depends on whether that person intends to assume that obligation") (emphasis in original) (quoting Gribble v. Gribble, 583 P.2d 64, 66 (Utah 1978)); 67A C.J.S. Parent and Child § 346 ("Whether the relationship of loco parentis exists is a matter of intention to be shown by the facts of the particular case . . . .").  We agree with this assessment.  A fact-finder may infer intent from circumstantial evidence.  McConnico v. Third Nat'l Bank, 499 S.W.2d 874, 885 (Tenn. 1973).  While not exclusive, some facts to consider when determining whether a person had the intent to establish an in loco parentis relationship may include the child's age, the child's dependence upon the person claimed to be in loco parentis, and whether that person supports the child and exercises the duties and obligations of a natural parent.  Gritzner v. Michael R., 611 N.W.2d 906, 919-20 (Wis. 2000) (quoting McManus v. Hinney, 143 N.W.2d 1 (Wis. 1966)).

---

[11] We also have used the term metaphorically in describing the Chancery Court's role in carrying out the intent of a creator of a trust.  Bennett v. Nashville Trust Co., 153 S.W. 840, 841 (Tenn. 1913) ("A court of equity, acting in loco parentis or occupying the place of the trust creator, in such case, does what it conceives would have been done by the creator had he foreseen the situation of his beneficiary in a substitution of another course of management in order to the completer realization of his purposed bounty.").

[12] Norton has been abrogated by modern domestic relations laws.  This case does not reflect the modern law as to the financial obligations of stepparents.  We merely cite to it as part of the historical backdrop for the in loco parentis doctrine in Tennessee.

To repeat, the only relevant undisputed facts in this case were that the Defendant was not the biological parent of Jessica Clark, not her legal guardian, and not married to her mother. This is simply not enough information to warrant a dismissal of the indictment. The State may present other circumstances that might establish a duty on the part of the Defendant arising out of an in loco parentis relationship. The Defendant's relationship with the mother may be circumstantial evidence of duty, but the ultimate question is the nature and degree of the Defendant's relationship with Jessica. In theory, the State might be able to establish that the Defendant failed to perform a statutory duty to provide adequate medical care for the child.[13] For these reasons, we hold that the Court of Criminal Appeals properly ruled that the trial court erred by granting the Defendant's motion to dismiss at this stage in the litigation.[14]

### III. Criminal Responsibility under Tenn. Code Ann. § 39-11-402

The Defendant argues that he cannot be guilty under a theory of criminal responsibility for conduct of another, which also is known as accomplice liability. Tennessee Code Annotated section 39-11-402 provides that a person may be held liable for the criminal acts of another when:

(1) Acting with the culpability required for the offense, the person causes or aids an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense;

(2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense; or

(3) Having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the person fails to make a reasonable effort to prevent commission of the offense.

This statute codified the common law theory, which "provided equal criminal liability for principals, accessories before the fact, and aiders and abettors." State v. Howard, 30 S.W.3d 271, 276 (Tenn. 2000) (citing Tenn. Code Ann. §§ 39-11-401, -402 Sentencing Comm'n Comments); see also State

---

[13] The State's bill of particulars indicates that it will attempt to show that the Defendant "held himself out as her father and one of her caretakers." We note that even if this were found to be true, the fact that the Defendant "held himself out" as the victim's father would not establish an in loco parentis relationship conclusively. The jury might consider it as circumstantial evidence of Defendant's intent to establish such a relationship, and his assumption of care. Whether an in loco parentis relationship was established, however, is a question for the jury.

[14] The Defendant also argues that "the state's theory of prosecution paradoxically creates criminal liability for failing to do an act that [the Defendant] is legally incapable of performing" because the Defendant would not have been able to provide medical care as a non-parent. While this may be a viable defense at trial, there simply are no facts in the record to establish it at this point.

10

v. Ward, 396 A.2d 1041, 1046 n.13 (Md. Ct. App. 1978) (quoting R. Perkins, Criminal Law 643 (2d ed. 1969)), overruled on other grounds by Lewis v. State, 404 A.2d 1073 (Md. 1979), as stated in Jones v. State, 920 A.2d 1, 10 (Md. Ct. App. 2007). The justification for this theory of criminal liability is that, in addition to the primary criminal actor, aiders and abettors should be held accountable for the criminal harms they intentionally facilitated or helped set in motion. Howard, 30 S.W.3d at 276; Key v. State, 563 S.W.2d 184, 186 (Tenn. 1978); State v. Grooms, 653 S.W.2d 271 (Tenn. Crim. App. 1983).

To prove guilt through a theory of criminal responsibility, the State must establish that the defendant "knowingly, voluntarily and with common intent unite[d] with the principal offender[] in the commission of the crime." State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)). Mere presence during the commission of a crime is insufficient to support a conviction. See Flippen v. State, 365 S.W.2d 895, 899 (Tenn. 1963). It is not, however, necessary for one to take a physical part in the crime; encouragement of the principal is sufficient. State v. McBee, 644 S.W.2d 425, 428 (Tenn. Crim. App. 1982).

Section 39-11-402(2) does not prescribe a separate and distinct crime; rather, it works in synergy with the charged offense to establish a defendant's guilt through the actions of another. State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). Formerly under our common law and now by statute, defendants convicted under a theory of criminal responsibility are considered to be principal offenders, just as if they had committed the crime themselves. State v. Carson, 950 S.W.2d 951, 954 (Tenn. 1997). A separate indictment for criminal responsibility is unnecessary when a defendant has been indicted for the primary offense. Lemacks, 996 S.W.2d at 170; State v. Barnes, 954 S.W.2d 760, 763 (Tenn. Crim. App. 1997).[15]

In this case, the State did not allege that the Defendant was guilty under a theory of criminal responsibility by assisting Crank's neglect of Jessica either in the indictment or the bill of particulars. Nevertheless, the State is not precluded from pursuing theories of criminal liability that are not mentioned in the bill of particulars, so long as such theories of liability do not exceed the scope of the indictment. See Lemacks, 996 S.W.2d at 173 ("An indictment that charges an accused on the principal offense 'carries with it all the nuances of the offense,' including criminal responsibility.") (quoting State v. Johnson, 910 S.W.2d 897, 900 (Tenn. Crim. App. 1995)).

Tennessee Rule of Criminal Procedure 7(c) provides, "On defendant's motion, the court may direct the district attorney general to file a bill of particulars so as to adequately identify the offense charged." A bill of particulars serves three purposes. First, the bill of particulars provides a "'defendant with information about the details of the charge against him if this is necessary to the preparation of his defense.'" State v. Byrd, 820 S.W.2d 739, 741 (Tenn. 1991) (quoting State v. Hicks, 666 S.W.2d 54, 56 (Tenn. 1984)). Second, it assures that a defendant has an opportunity to

---

[15] We recognize that this is not a uniform approach taken in all states. See Michael v. State, 805 P.2d 371 (Alaska 1991); Barren v. State, 669 P.2d 725 (Nev. 1983).

"'avoid prejudicial surprise at trial.'" Id. Finally, it enables the defendant to preserve a plea against double jeopardy. Id.; see also State v. Speck, 944 S.W.2d 598, 600 (Tenn. 1997). A bill of particulars is not a discovery device and is limited to information a defendant needs to prepare a defense to the charges. Tenn. R. Crim. P. 7(c), Advisory Comm'n Comments.

The trial court should make every effort to ensure that the State supplies all critical information in its bill of particulars, but lack of specificity will not result in reversible error unless a defendant can prove prejudice. Speck, 944 S.W.2d at 601; Byrd, 820 S.W.2d at 741. Such prejudice cannot be found until after all proof has been presented. We have held that

> it is only by post hoc examination of the matter that the court will be able to determine whether deficiencies in the bill of particulars prevented the defendant from preparing an adequate defense, caused undue and prejudicial surprise, or made untenable a later plea of double jeopardy. In other words, the trial court cannot determine whether or not the defendant has been hampered in his defense until the court knows what proof the state will offer as to time and place of the offense, and how this evidence relates to the actual theory of defense.

Byrd, 820 S.W.2d at 741 (emphasis added). In short, the purpose of the bill of particulars is to alert criminal defendants as to how the State will proceed with the litigation. The purpose is not to lock the State into a specific theory of prosecution. See State v. Stephenson, 878 S.W.2d 530, 539 (Tenn. 1994) (holding that a trial court does not err by denying a defense motion for a bill of particulars where the defense is attempting to compel the State to commit to a theory of liability either as a principal or an accessory). If the State significantly deviates from the bill of particulars at trial, this potentially could be a ground for reversal, but only if a defendant can, as stated, demonstrate prejudice in the form of unfair surprise or inability to prepare an adequate defense.[16] Byrd, 820 S.W.2d at 741.

In this instance, the Defendant cannot show the requisite degree of prejudice for the obvious reason that there has yet to be a trial in which prejudice may arise. Because we have not been availed of the evidence the State will put forward, we cannot predict how it might affect the Defendant's ability to present a defense. The same was true of the trial court when it dismissed the indictment. Because criminal responsibility has not been eliminated as a possible theory of guilt, granting Defendant's motion to dismiss was improper.

The Defendant further argues that even if the State was not precluded from proceeding on a criminal responsibility theory by the bill of particulars, criminal responsibility could not apply to him, given the facts of the case. The Defendant claims that no reasonable person could interpret his actions as an intent to promote, assist, benefit from, solicit, direct, aid, or attempt to aid Crank in

---

[16] Interestingly, Federal Rule of Criminal Procedure 7(f) provides procedures for amending a bill of particulars, but a corresponding provision is absent from the Tennessee Rules of Criminal Procedure. See State v. Noble, No. E2005-00011-CCA-R3-CD, 2006 WL 317005 (Tenn. Crim. App. Feb. 10, 2006).

12

committing child neglect. This limited record does not place us in a position to either agree or disagree with this assertion. We cannot determine whether a reasonable juror could find that the Defendant's conduct aided, assisted, or encouraged Crank to engage in conduct constituting child neglect. At the close of the proof, the trial court may consider whether the evidence is insufficient to sustain a conviction. Tenn. R. Crim. P. 29 (2007). The sufficiency of the evidence then would be subject to appellate scrutiny. State v. Price, 46 S.W.3d 785, 819 (Tenn. Crim. App. 2000).

## Conclusion

When considering a motion to dismiss, a trial court may consider the undisputed facts. On appeal, a judgment applying undisputed facts to the law is subject to de novo review. Further, a person in loco parentis to a child may have a duty of care, the violation of which may warrant criminal penalties. Finally, the failure to assert criminal responsibility for the acts of another in a bill of particulars does not preclude prosecution under that theory of criminal liability because it is an integral component of the charged offense. The judgment of the Court of Criminal Appeals is, therefore, affirmed, and the cause is remanded to the trial court for further proceedings consistent with this opinion. Costs of the appeal are taxed to appellant.

_____
GARY R. WADE, JUSTICE