# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### April 9, 2013 Session

## STATE OF TENNESSEE v. ANTONIO GRANDBERRY

**Appeal from the Criminal Court for Shelby County**
**No. 11-00455    James M. Lammey, Jr., Judge**

**No. W2012-00615-CCA-R3-CD  -  Filed June 21, 2013**

Antonio Grandberry ("the Defendant") was convicted by a jury of especially aggravated robbery. Pursuant to an agreement between the Defendant and the State, the trial court sentenced the Defendant to eighteen years' incarceration. On appeal, the Defendant argues that the evidence presented at trial was insufficient to support his conviction. Additionally, the Defendant asserts that the trial court erred in not instructing the jury on the offense of facilitation of especially aggravated robbery. After a thorough review of the record and the applicable law, we conclude that the evidence is insufficient to support a conviction of especially aggravated robbery or any of the lesser-included offenses pertaining to robbery but is sufficient as to the lesser-included offense of aggravated assault. Accordingly, we modify the Defendant's especially aggravated robbery conviction to aggravated assault and remand this matter for a new sentencing hearing.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment
### of the Criminal Court Affirmed as Modified; Remanded

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which ALAN E. GLENN, J., joined. JOHN EVERETT WILLIAMS filed a separate opinion, dissenting in part and concurring in part.

Neil Umsted, Memphis, Tennessee, for the appellant, Antonio Grandberry.

Robert E. Cooper, Jr., Attorney General & Reporter; Sophia S. Lee, Senior Counsel; Amy Weirich, District Attorney General; and Chris Larreau, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

A Shelby County Grand Jury indicted the Defendant on one count of especially aggravated robbery. The Defendant proceeded to a jury trial held February 27-March 1, 2012.

Tony Deangelo Tapplin, the victim, testified at trial that he graduated from Sheffield High School in 2009. Tapplin explained that he drove Sam Vester and a couple of Vester's friends to a party on September 25, 2010. He denied that anyone was drinking or "smoking weed" at the party. He continued,

> When I came in I seen [sic] one of my kinfolks. I shook his hand. And then I came on the dance floor, sitting there a couple of minutes and then one of my songs came on, start dancing. And after while I seen [sic] people walking around with guns. That was the whole purpose of me leaving the party.

Tapplin remembered seeing "[a] couple handguns and one big long gun." While Tapplin was on the dance floor, he observed other individuals "flashing money," so he began doing so as well. According to Tapplin, "It's just something young people do." He denied seeing the Defendant at the party. He estimated that he stayed at the party for approximately an hour.

After leaving the party, Tapplin went to sit in the driver's seat of his car at approximately 1:00 or 2:00 am. Soon after, he heard gunshots, and Vester and his friends ran toward the car. Several other individuals also ran toward his vehicle.

The first man who approached Tapplin in his car was "short and dark skinned" and had a handgun. This man opened the door and told Tapplin, "Give me everything you got." According to Tapplin, the man hit Tapplin with the handgun, and then another man approached from the front passenger side and punched Tapplin in the face. While he was getting punched, the man with the handgun searched Tapplin's pockets and took Tapplin's money and cell phone. According to Tapplin,

> Once he get [sic] my money, he keep on asking me do I go [sic] some more. I'm like, I ain't go no more. He go in my pocket and I ain't got nothing else. Then he closed the door. Then the big dude come with a big ole baseball bat, hit my window.

-2-

After this individual shattered Tapplin's window, Tapplin observed a man he identified as the Defendant approach him and shoot him. He was "100 percent positive" that it was the Defendant who shot him, and he was adamant that he had not seen the Defendant before this incident. He estimated that this entire incident lasted "[a] little bit more" than thirty seconds. The individuals left, and Tapplin fled from the vehicle and ran behind a house. He heard some of the men return and say, "[H]e's not in the car." He believed that these men then damaged his car more because

> when I was in the car they only hit one window, the window I was in. But once I seen [sic] my car it was brutally bad. The two headlights was [sic] messed up, the front window, the back window, my window and the front rearview mirror, . . . and the hood was beat up.

Tapplin identified from a photograph of his vehicle the bullet hole from the bullet that entered his vehicle and hit him. According to Tapplin, the Defendant was within arm's reach of the vehicle at the time that he shot Tapplin.

Tapplin stood during trial and identified the entrance and exit wounds of the bullet, which were in his left knee area. His injury required surgery and the insertion of a metal rod. He was in the hospital for two weeks and was unable to walk for six months.

After a nearby resident called the police, Tapplin waited for approximately ten minutes before police or an ambulance arrived. He could not remember whether he spoke to police at the scene. He knew that he lost a lot of blood, but he remained conscious while waiting for emergency personnel. Sometime between 3:05 and 3:30 a.m., Tapplin arrived at the hospital. Approximately seven hours later, police officers visited him in the hospital and showed him a photographic lineup. Tapplin identified the lineup at trial on which he had circled the picture of the Defendant and wrote, "He shot me." He could not recall whether he was taking pain medication at the time but confirmed that he identified the Defendant with a "clear head."

On cross-examination, Tapplin agreed that his car was facing the house where the party was. At the point that he heard the gunshots, he observed a large group running toward the car. He believed that more than twenty people were in this group running toward and surrounding the car, and, initially, he did not see any guns or bats.

Tapplin explained that the man who punched him from the passenger side immediately ran away after searching through the car for valuables. The short, "dark skinned" man with the handgun, however, stayed nearby, shut the door, and only "backed back" after searching Tapplin. Tapplin stated that this man "was still at the car though." The

man with the bat then hit and shattered the driver's side window. At this point, he observed the Defendant walking toward him with an assault rifle pointed at him.

Tapplin denied that the Defendant was wearing a hat. He confirmed that he did not see the Defendant at the party interacting with these other individuals. He stated that, after he was shot, "I seen [sic] where they were going. Once he shot me I leaned down. Then I looked back upon and I seen [sic] . . . the big guy with the bat walking toward [the Defendant] walking back up and the short black guy walking up towards the house."

Tapplin also acknowledged that he had $1,000 in cash on his person before leaving with Vester for the party. He denied that any fight occurred at the party prior to his seeing the guns and deciding to leave.

Tapplin did not remember speaking with officers at the scene. Specifically, he did not recall telling officers at the scene that he was hit in the head with a bat while inside the house at the party. He also denied telling the officers that the Defendant took his money or that "several people were jumping on [his] car beating it with bats and sticks."

Tapplin also denied telling Sergeant Beasley at the hospital that the Defendant was five feet, six inches tall or that he was wearing a white polo. He was certain that the Defendant was not wearing a hat. Additionally, he denied telling Sergeant Beasley that he left the party because he thought the party was boring. He did not recall receiving pain medication when he arrived at the hospital.

Tapplin remembered testifying at a juvenile proceeding involving the Defendant during which he identified the Defendant as the person who shot him. He never was able to retrieve his money or cell phone.

The defense called Sergeant Beasley with the Memphis Police Department ("MPD") as the next witness.[1] He testified that he spoke with Tapplin at the hospital sometime between approximately 3:00 to 3:30 a.m. on September 25, 2010. He recalled that Tapplin was "coherent, lucid, nothing out of the ordinary." He did not take a formal written statement but simply took brief notes while speaking with Tapplin to include in a "supplement" to the case. Tapplin described to him that the man with the shotgun was "a male black, short in stature, medium complexion and a white polo shirt." Tapplin told him this individual was "about five-six" and in his late teens or early twenties. As to the

---

[1] The defense called Sergeant Beasley out of order, with the permission of the trial court, due to Sergeant Beasley's unavailability later in the trial.

individual with the handgun, Tapplin described him to Sergeant Beasley as "[s]hort, dark complexion, white T-shirt, [and] armed with a handgun."

Tapplin also told Sergeant Beasley that he left the party because he thought the party was boring and that it was the man with the shotgun, not the handgun, who said to Tapplin, "[G]ive me everything you got, I know you got some more." Tapplin never told Sergeant Beasley about a man with a bat.

On cross-examination, Sergeant Beasley admitted that he had no independent memories apart from the supplement he completed regarding the description that Tapplin gave him. He acknowledged that the description of the two males was not within quotation marks as other parts of the interview with Tapplin, so he could not verify that Tapplin gave him the descriptions verbatim as written.

Sam Vester, Tapplin's friend, testified as the State's next witness that he was with Tapplin on the night that Tapplin was shot. Vester testified,

> As I was approaching to leave the party, I was walking towards Tony Tapplin['s] car and then about three minutes when I got into the car, they was [sic] yelling get out of the car, lay everything down. So I got out of the car and laid on the ground. As I laid on the ground, the person who had the bat was swinging the bat at me. I tried to get up and I put my hand over my face and I got hit with the bat across my elbow and I fell on the ground. I give it about three minutes after I heard some gunfire, I ran.

He confirmed that, at the time the incident ensued, he was sitting in the vehicle with Tapplin and another individual, Tevin Bennett. Vester remembered that "more than ten" individuals surrounded Tapplin's vehicle during this incident. He denied seeing people with guns and did not remember giving a statement that he "saw two individuals with bats and one person with a shotgun and one person with a handgun." He stated that he could not see anyone because it was so dark outside.

He remembered that he and Tapplin followed Vontario Edwards to the party. He recalled that Edwards' vehicle was a maroon or "red color" Ford Taurus.

On cross-examination, Vester identified a photographic lineup sheet bearing his signature that contained a red check mark next to "The witness was unable to make a positive identification." Although he told police at the scene that he saw a shotgun, he explained at trial that he only heard the gunshot and assumed it was from a shotgun based on the sound.

-5-

Leon Plummer testified that he and his brother hosted a party at 3436 Red Coat on the evening of September 24, 2010. He stated that he had known the Defendant since the Defendant was in elementary school. Plummer had advertised this party on a social networking website, and he estimated that more than 200 people attended the party, many of whom he did not know. He recalled that music was playing and people were "flashing money." At some point, he observed "a lot of people barging out the door," and, at that point, he saw the Defendant walking toward the street with an "SKS." Plummer recalled that the Defendant was wearing a white shirt. At some point, Plummer heard a gunshot and someone yell, "[Y]ou know what this is," and Plummer went back inside the house. A little later, the Defendant returned to the house with the "SKS." Plummer watched the Defendant place the gun under a mattress. When the police arrived, Plummer initially denied that any weapons were in the house. However, when the police told him that his grandmother, who owned the house, could be charged criminally, he told the police where the rifle was and that it belonged to the Defendant.

Plummer recalled that the Defendant was wearing a gray shirt when the police arrived, which was approximately twenty to thirty minutes after he observed the Defendant hide the gun. He identified a photographic lineup bearing his signature on which he had circled the Defendant's picture and wrote, "This is [the Defendant] and he had the SKS."

Plummer knew that an individual who goes by "Squeaky" had a bat, and he heard others say that this person returned to the vehicle after the robbery and began hitting the car again. He also knew that "Duke" and "Bam" were the two men who "hopped in the bed with [his] grandmother" when the police arrived.

On cross-examination, Plummer agreed that people were drinking alcohol and smoking marijuana at the party. He also remembered that the Defendant, prior to the shooting, was wearing a white t-shirt, jeans, and a gray hat. He confirmed that both the "SKS" and a 38-revolver were hidden underneath his brother, Jake Plummer's, bed when police arrived. He explained that another brother, Jerome Ewing, owned the "SKS." On redirect examination, however, he stated that Ewing no longer owned the gun on the night of the incident.

Officer Demar Wells, a crime scene investigator with the MPD, testified that he responded to a call on Red Coat Street on September 25, 2010. He entered a bedroom of the house where he found a revolver handgun and wood-bodied rifle. From the revolver, he recovered five live rounds and one spent shell casing. On cross-examination, he denied finding any nine millimeter rounds at the scene. He also denied ever receiving a request to test either weapon for fingerprints.

Sergeant Michael Rosario with the MPD testified that his involvement in this incident included creating a photographic lineup. After creating the lineup, he accompanied some other officers to the hospital to meet with Tapplin. Tapplin signed an "advice of rights" form at 10:06 a.m. regarding the photographic lineup. Within seconds of showing Tapplin the photographic lineup, Tapplin identified the Defendant as the shooter.

On cross-examination, he confirmed that his notes had no instructions to include "Squeaky," "Duke," or "Bam" in the photographic lineup. Contrary to Tapplin's testimony, his recollection was that Tapplin identified the Defendant not only as the shooter but also as the person who stole his $1,000.

At the conclusion of the State's proof, the defense moved for judgment of acquittal, and the trial court denied the motion. The Defendant chose not to testify. Prior to calling the defense witness, the trial court discussed the jury charge with the State and the defense outside the presence of the jury. The defense objected to the proposed instruction regarding criminal responsibility, and the trial court overruled the objection. The defense then requested that the trial court include instructions on solicitation and facilitation. The trial court denied both requests. Regarding facilitation, the trial court stated,

> Facilitation is where someone lends substantial assistance to someone but not having the same intent as the main principal. I don't know how you can make that jump. There's nothing in the record that says that he didn't have the intent to rob this individual himself.

After the conclusion of further discussion regarding the proposed charges, the defense then proceeded with its case in chief.

Dr. Jeffrey Neuschatz testified as an expert in eyewitness identification. He currently worked as an associate professor and chair of the psychology department at the University of Alabama in Huntsville. He had never met the Defendant and stated that the purpose of his testimony was "to educate the Court and the jury about issues related to eyewitness identification." He testified,

> What happens is when you watch a complex event, you're taking fragments of that event. It's not a complete record. And you fill that in with gaps with what you already know happens in those situations so you put this all together to form memory. And once you have a memory, it's not like a picture. . . . Every time you revisit a memory, retell it, rethink about it, it can change dramatically. . . . We may strip away details that don't seem plausible given

what we know about events or we may add in other details that we know probably happened in those events even if don't have a good memory of them.

Dr. Neuschatz continued,

[T]he research shows that when you're in a stressful situation that your memory is impaired so that some people have the belief that when you're in a very stressful situation you can take a snapshot of what's going on and you can remember it. Turns out in identification situations that's not the case. People are exposed to high stress situations, their identification accuracy seems to be worse or is worse than people who are not exposed to high stress situations.

Dr. Neuschatz reviewed Tapplin's testimony from the juvenile proceeding. Based on that review, Dr. Neuschatz believed that Tapplin underwent a very stressful situation during the course of the events related to this case. He explained, "There's a term called weapon focus. And the idea is that when there's a weapon, people focus on the weapon as opposed to when there's not a weapon. It hurts their identification accuracy." He believed that it would be difficult for someone to identify another person when it is dark outside, there is only three seconds of viewing time, there is a gun present, and "the viewer had just been pistol whipped and punched and robbed." On cross-examination, however, Dr. Neuschatz acknowledged that a person focusing on someone's hair could help aid that person's memory. He also agreed that the better practice for memory retention is to show someone a photographic lineup as soon after the event as possible.

At the conclusion of the proof, the jury deliberated and found the Defendant guilty of especially aggravated robbery. At a subsequent hearing, the trial court sentenced the Defendant to eighteen years' incarceration pursuant to a sentencing agreement between the State and the Defendant.

The Defendant filed a motion for new trial, which the trial court subsequently denied. The Defendant now appeals, arguing that the evidence presented at trial was insufficient to support his conviction. Additionally, he contends that the trial court erred in not instructing the jury on the offense of facilitation.

Analysis

*Sufficiency of the Evidence*

The Defendant challenges the sufficiency of the evidence supporting his conviction for especially aggravated robbery. Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

The weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Furthermore, it is not the role of this Court to reevaluate the evidence or substitute its own inferences for those drawn by the jury. State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003) (citations omitted).

Especially aggravated robbery[2] as charged in this case is defined as a robbery "(1) [a]ccomplished with a deadly weapon; and (2) [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-402(a) (2010). Robbery, in turn, is defined as "the

_____

[2] This offense is a Class A felony. See Tenn. Code Ann. § 39-13-402(b).

intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. § 39-13-401(a) (2010). A person commits theft of property "if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Id. § 39-14-103(a) (2010).

A person is criminally responsible for crimes committed by another when, "[a]cting with intent to promote or assist the commission of the offense, *or* to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2) (2010) (emphasis added). Our supreme court has explained that "[t]he justification for this theory of criminal liability is that, in addition to the primary criminal actor, aiders and abettors should be held accountable for the criminal harms they intentionally facilitated or helped set in motion." State v. Sherman, 266 S.W.3d 395, 408 (Tenn. 2008). As long as the State can prove that a defendant knowingly, voluntarily and with common intent joined with the principal offender in the commission of the crime, the State may seek to hold the defendant criminally liable as a principal under the theory of criminal responsibility for the conduct of another. Id.; see also State v. Hatcher, 310 S.W.3d 788, 811 (Tenn. 2010). "The requisite criminal intent may be inferred from the defendant's 'presence, companionship, and conduct before and after the offense.'" State v. Crenshaw, 64 S.W.3d 374, 384 (Tenn. Crim. App. 2001) (quoting State v. McBee, 644 S.W.2d 425, 428-29 (Tenn. Crim. App. 1982)). While a person's mere presence during the commission of a crime is not sufficient to confer criminal liability, it is not necessary that he or she take physical part in the crime. Sherman, 266 S.W.3d at 408. Rather, encouragement of the principal actor will suffice. Id. A defendant convicted under a theory of criminal responsibility for the conduct of another is considered a principal offender to the same extent as if he had committed the offense himself. See Hatcher, 310 S.W.3d at 811.

The Defendant first argues that the State failed to establish that the Defendant was criminally responsible for the underlying offense. Specifically, he contends that the State failed to prove that he had the requisite intent required to be held criminally responsible.

The State established at trial that several individuals ran toward Tapplin's vehicle after Tapplin heard gunshots fired. Initially, an individual with a handgun opened the driver's side door and told Tapplin, "Give me everything you got." According to Tapplin, the man hit Tapplin with the handgun, and then another man approached from the front passenger side and punched Tapplin in the face. While he was getting punched, the man with the handgun searched Tapplin's pockets and took Tapplin's money and cell phone. According to Tapplin,

> Once he get [sic] my money, he keep on asking me do I go [sic] some more. I'm like, I ain't go [sic] no more. He go in my pocket and I ain't got nothing

else.  Then he closed the door.  Then the big dude come with a big ole baseball bat, hit my window.

At some point after this second individual shattered Tapplin's window, Tapplin observed a third man he identified as the Defendant approach him and shoot him.  Moreover, Tapplin testified, "I seen [sic] where they were going.  Once [the Defendant] shot me I leaned down.  Then I looked back upon and I seen [sic] . . . the big guy with the bat walking toward [the Defendant] walking back up and the short black guy walking up towards the house."

This limited testimony, even considered in the light most favorable to the State, merely establishes, at most, that all these individuals were present at the scene.  Given that mere presence is not enough to confer criminal liability, we are constrained to hold that the State failed to present sufficient evidence that the Defendant knowingly, voluntarily and with common intent joined with the principal offender in the commission of the robbery.  See Sherman, 266 S.W.3d at 408.  Thus, we hold that the evidence was insufficient at trial to convict the Defendant of especially aggravated robbery.[3]  Moreover, the same analysis

_____

[3] The dissent concludes that sufficient evidence does exist to sustain this conviction.  The dissent contends that the evidence shows concerted efforts among the Defendant, "Duke," and "Bam."  The dissent relies on two major sources for this conclusion.  First, the dissent relies on some purported prior statements of the victim which the victim unequivocally denies making in his own testimony at trial.  Second, the dissent relies on testimony from Plummer to connect these three individuals.  Yet, a review of the record demonstrates that Plummer expressly denied ever seeing the Defendant with either of these individuals on the night of this incident.  Also, contrary to the impression given by the dissent, Plummer expressly denies that the Defendant returned to the house that evening with Duke or Bam.  Moreover, a close reading of the record confirms that no weapon ever was connected to Duke or Bam that evening.  Additionally, the dissent references and relies upon a prior statement given to police by Plummer as the piece of evidence establishing that the Defendant ran back into the house with Duke and Bam.  Yet, that statement appears nowhere in the record.  The only references to the statement in the record are in the form of questions to Plummer during cross-examination by the Defendant's counsel.  See State v. Antonio Morrow, No. 02C01-9709-CR-00358, 1998 WL 351223, at *3 (Tenn. Crim. App. July 2, 1998) (citation omitted) ("[I]t is fundamental that attorney's questions, comments, and arguments are not evidence."), perm. app. denied (Tenn. Feb. 1, 1999). Furthermore, the dissent does not address the temporal  issue raised by the defense in its sufficiency argument, an issue that has resulted in conflicting rulings by prior panels of this Court.  See State v. Antonio Warfield, No. M2011-01235-CCA-R3-CD, 2012 WL 4841546, at *12 (Tenn. Crim. App. Oct. 5, 2012) (noting that State v. Owens held that the "violence or fear," not the bodily injury, must "precede or be contemporaneous with the taking of property") (quoting State v. Owens, 20 S.W.3d 634, 641 (Tenn. 2000)). Contra State v. Michael Deshay Peoples, Jr., M2009-01783-CCA-R3-CD, 2010 WL 3528986, at *9 (Tenn. Crim. App. Sept. 10, 2010), perm. app. denied (Tenn. Feb. 17, 2011) ("The serious bodily injury required for a conviction of especially aggravated robbery must 'precede or be concomitant to or contemporaneous with the taking of property.'" (quoting Owens, 20 S.W.3d at 637)).  Finally, one is led to question why these individuals never were identified by the victim nor charged by the State in this case if the Defendant were

(continued...)

-11-

applies to all of the lesser-included offenses pertaining to robbery. Thus, the evidence also is insufficient as to these offenses.[4]

As a result, we next consider whether the evidence was sufficient as to the lesser-included offense of aggravated assault. Aggravated assault is defined as "intentionally, knowingly, or recklessly caus[ing] bodily injury to another" which results in "serious bodily injury" or where the defendant "[u]ses or displays a deadly weapon." Tenn. Code Ann. §§ 39-13-101, -102 (2010). A "deadly weapon" can be "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Id. § 39-11-106(5)(B) (2010).

The evidence established at trial that the Defendant approached Tapplin's vehicle with a shotgun and shot through the passenger door, hitting Tapplin in the leg. Furthermore, Tapplin's gunshot wound to the left knee required surgery and the insertion of a metal rod, resulting in a two-week hospital stay. Additionally, the evidence established that Tapplin was unable to walk for six months. Viewing these facts with the strongest legitimate view in favor of the State, see Harris, 839 S.W.2d at 75, the jury had sufficient evidence before it to find that the Defendant caused injury to Tapplin while using a deadly weapon. Thus, the evidence is sufficient to support a conviction of aggravated assault. Accordingly, we modify the Defendant's conviction from especially aggravated robbery to aggravated assault.

### CONCLUSION

We conclude that the evidence is insufficient to support a conviction for especially aggravated robbery or any of the lesser-included offenses pertaining to robbery. We, however, hold that the evidence is sufficient to support a conviction for aggravated assault. Accordingly, we modify the Defendant's conviction to aggravated assault and remand the case to the trial court for a new sentencing hearing.

_____
JEFFREY S. BIVINS, JUDGE

---

[3](...continued)
so closely tied to Duke and Bam as inferred by the dissent.

[4] As a result of our conclusion that the evidence is insufficient to convict the Defendant of especially aggravated robbery or any of the offenses pertaining to robbery, we find it unnecessary to address the problematic issue of the trial court's failure to charge the offense of facilitation as a lesser-included offense of these robbery offenses.