IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 10, 2015


STATE OF TENNESSEE v. JENNIFER LOPEZ AND SERGIO H.
GONZALEZ


Appeal from the Criminal Court for Davidson County
No. 2012-A-435     J. Randall Wyatt, Jr., Judge

_____

No. M2014-01701-CCA-R3-CD – October 16, 2015

_____

Following a jury trial, Jennifer Lopez ("Defendant Lopez") was convicted of one count of aggravated child neglect, and her ex-boyfriend, Sergio H. Gonzalez ("Defendant Gonzalez") was convicted of two counts of aggravated child neglect in connection with severe abdominal injuries received by Defendant Lopez's two-year-old son, N.L, in September 2011.[1]  On appeal, Defendant Gonzalez argues that: (1) the trial court erred in denying his motion to suppress his September 27, 2011 interview with lead investigator, Detective Pilarski; (2) the trial court erred in allowing the State to introduce evidence of N.L.'s bruises; (3) the trial court erred in preventing Defendant Gonzalez from impeaching Detective Pilarski with evidence from the detective's personnel file; (4) the evidence was insufficient to support his convictions; and (5) the trial court erred when it sentenced Defendant Gonzalez to twenty years for one of his aggravated child neglect convictions.  Defendant Lopez argues that: (1) the trial court erred in failing to strike "improper statements made by the State's attorney in closing arguments"; (2) the evidence was insufficient to support her conviction; and (3) the trial court erred when it sentenced her to seventeen years.  Discerning no error, we affirm the judgments of the trial court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Manuel B. Russ (on appeal), Nashville, Tennessee, and Brian T. Boyd (at trial), Brentwood, Tennessee, for the appellant, Jennifer Marie Lopez.

---

[1] Consistent with the policy of this court, minors are identified by their initials.

Jeffrey T. Daigle, Nashville, Tennessee, for the appellant, Sergio H. Gonzalez.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

The Davidson County Grand Jury indicted the Defendants with the following charges:

| Count | Charge | Defendant |
|-------|--------|-----------|
| 1 | Aggravated Child Abuse | Defendant Gonzalez |
| 2 | Aggravated Child Neglect | Defendant Gonzalez |
| 3 | Aggravated Child Neglect | Defendant Gonzalez and Defendant Lopez |

*Trial*

At trial, notes taken by a social worker, Alisa Lisbon, and a nurse practitioner, Carrie Donnell, who interviewed each of the Defendants individually were read into the record without objection from the Defendants. The notes established that on September 22, 2011, N.L. lived with his mother, Defendant Lopez, and his mother's then-boyfriend, Defendant Gonzalez, as well as his sisters, four-year-old A.L. and six-month-old G.G. Although Defendant Gonzalez was not the biological father of N.L. or A.L., he acted as a father figure in their lives, and Defendant Gonzalez would watch the children while Defendant Lopez was at work at Travel Lodge. Defendant Lopez described N.L. as a "'difficult child' who wants to be 'into everything and fights with his older sister.'" Often, A.L. bit, kicked, and hit N.L. The Defendants disciplined the children by spanking them "on the hand or the bottom." Defendant Gonzalez had noticed some bruises on N.L. before September 22, 2011, but he attributed the bruises to A.L. kicking and biting N.L. Defendant Lopez told Ms. Donnell that she had not noticed any bruises on N.L. in the week before N.L. became ill, but she thought A.L. could have bruised N.L.

On the evening of September 21, 2011, N.L. ate a normal dinner, and Defendant Lopez put the children to bed before she left for work. She returned to the home after her shift the next morning and went to sleep. N.L. woke up around 8:00 a.m. on September 22 and was "running around." Around 10:00 a.m. or 11:00 a.m., Defendant Gonzalez left the house to meet a lady from church to pick up mattresses for the children, and he reported that he was gone approximately one hour. Before he left, Defendant Gonzalez locked N.L. and A.L. in Defendant Lopez's bedroom, and he instructed A.L. not to let N.L. go into the kitchen. While Defendant Gonzalez was gone, N.L. began to vomit "watery brown liquid." When Defendant Gonzalez returned home, he found a "big mess" in the kitchen and A.L. watching television. N.L. was lying with Defendant Lopez on Defendant Lopez's bed. Defendant Gonzalez stated in his interview that Defendant Lopez was awake with N.L. when he returned home. However, Defendant Lopez stated in her interview with Ms. Donnell that Defendant Gonzalez woke her up to tell her that N.L. was vomiting. N.L. was lethargic for most of the day, which was unusual for him. Defendant Lopez told Ms. Donnell that N.L. only wanted to lie down and that he would moan whenever someone touched him or tried to pick him up. N.L. refused to eat and vomited about seven or eight times during the day. N.L. was able to drink small amounts of juice and soda but was unable to keep the liquid down. Defendant Lopez also reported that N.L. had fallen down at one point in the afternoon but stood back up without difficulty.

At some point, the Defendants went to the store to buy N.L. anti-nausea medication because N.L. was complaining of a stomachache. Also, Defendant Lopez called Vanderbilt Children's Hospital Emergency Department, but the hospital would not give her advice over the phone and instructed her to bring N.L. in "if he looked worse." Defendant Lopez thought N.L.'s condition was improving, so she did not take him to the emergency room. When asked if she contacted N.L.'s pediatrician, Defendant Lopez stated that she did not know how to contact the pediatrician after hours.

Defendant Lopez took N.L. and A.L. to work with her on the evening of September 22, 2011, so that she could keep an eye on N.L. While there, N.L. tried to drink some Pedialyte, but he was unable to keep it down. That night, Defendant Lopez called Southern Hills Medical Center a number of times to make sure there would not be a long wait if she brought N.L. to the emergency room. Approximately 5:00 a.m. on September 23, 2011, Defendant Lopez took N.L. to the vending machine to try to coax him to eat, and N.L. collapsed on the floor next to the vending machine. At that point, Defendant Lopez took N.L. to Southern Hills Medical Center, where he was admitted and then transferred to Vanderbilt Children's Hospital.

Following these interviews, Ms. Lisbon referred the case to the Department of Children's Services because of N.L.'s "significant unexplained injuries." On cross-

examination, Ms. Lisbon stated that she would consider Defendant Lopez to be a responsible person because she was nineteen years old at the time N.L. was injured, was taking care of three young children as well as her seventeen-year-old sister, and was holding down a job.

Detective Jacob Pilarski of the Metro-Nashville Police Department testified that he received a report from Vanderbilt Children's Hospital about a child who had suffered abdominal injuries. He spoke with Defendant Lopez and Defendant Gonzalez at Vanderbilt Children's Hospital on September 23, 2011, and made an audio recording of those interviews. Those recordings were played for the jury.

In her interview with Detective Pilarski, Defendant Lopez recalled that she had taken N.L. to her sister's house on September 21, 2011, but N.L. did not get out of the car. She went to work that evening and returned home on the morning of September 22. While Defendant Lopez was lying down in her bedroom, Defendant Gonzalez left to pick up some mattresses from a lady from their church. Defendant Lopez recalled that, at this time, all the children were still asleep. When Defendant Gonzalez returned home, he woke up Defendant Lopez to tell her that N.L. was throwing up. Defendant Lopez cleaned up N.L. and spent the day watching him. She reported that N.L. was lethargic, did not want to eat, and was not able to keep anything down. That evening Defendant Lopez took N.L. and A.L. to work with her in order to monitor N.L.'s condition. She recalled that N.L.'s stomach was "hard" and she thought that he was constipated because he had not gone to the bathroom all day. She said she did not believe Defendant Gonzalez would have hurt N.L. She did not know what caused N.L.'s injuries, and she denied causing the injuries herself.

In his initial interview with Detective Pilarksi, Defendant Gonzalez admitted that he lost his temper on the morning of September 22, 2011, and that he struck N.L. once, harder than normal, in N.L.'s side. Defendant Gonzalez said he thought he may have caused N.L.'s injuries, but he maintained that he loved N.L and did not mean to hurt N.L. After Defendant Gonzalez's interview, Detective Pilarski spoke with Defendant Lopez and she said, "I just have to forgive [Defendant Gonzalez] because N.L. is all right and is going to be fine." Defendant Gonzalez was arrested later that day.

Detective Pilarski interviewed Defendant Gonzalez again on September 27, 2011, and an audio-video recording was made of that interview. That recording was also played for the jury. In that interview, Defendant Gonzalez repeatedly denied hitting N.L. hard enough to cause N.L.'s injuries. He maintained that he spanked N.L. with an open hand, and he gestured to the side of his torso to show where he spanked N.L. In response to Defendant Gonzalez's gesture, Detective Pilarski gestured to his own side and noted that the side of the torso was where the liver was located and that N.L.'s liver had been injured. At this time Defendant Gonzalez did not try to clarify that, when he gestured to

- 4 -

his side, he was trying to say he spanked N.L. on the hip or bottom as opposed to the torso. Later in the interview, Defendant Gonzalez used a doll to show that he hit N.L. once, not very hard, on his back with an open hand. Also, Defendant Gonzalez made several suggestions as to other causes for N.L.'s injuries. He insinuated that Defendant Lopez hit N.L. after he had left the house to get the mattresses, but he claimed that he did not know whether Defendant Lopez caused the injuries because he was not present at the time. He stated that A.L. often pushed N.L. very hard, hit him, and threw things at him. Defendant Gonzalez also hypothesized that someone could have hit N.L. when he was being watched by Defendant Lopez's sister, April, and her boyfriend during the day on September 21. Finally, he said both N.L. and A.L. knew how to open the front door, and he suggested that N.L. got out of the house and fell, thereby causing his own injuries. Defendant Gonzalez insisted that he loved N.L. and that he did not cause N.L.'s injuries.

In the course of his investigation, Detective Pilarski verified that Defendant Lopez was at work at Travel Lodge in the early morning hours of September 21 and 22, 2011. Detective Pilarski also investigated the phone records for the Defendants' shared cell phone.

On cross-examination, Detective Pilarski admitted that he had not received any formal training about internal abdominal injuries or how bruising occurs, but he maintained that he learned how such injuries can occur during his experience with the police department. Based on his experience, he did not believe N.L.'s abdominal injuries were caused accidentally or by fighting with his four-year-old sister. Detective Pilarski stated that he could not separate the bruising on N.L's legs and arms from N.L.'s abdominal injuries, but he noted that the bruising occurred during the same time frame as the other injuries because neither Defendant Lopez nor Defendant Gonzalez mentioned any bruising before the incident which caused N.L.'s injuries. However, Detective Pilarski also admitted that it was feasible that the bruising could have happened "purely through accidental means" and independent of the cause of N.L.'s other injuries. Detective Pilarski also recalled that Defendant Gonzalez gave several alternative theories for how N.L. was injured, including falling down the stairs or a TV falling on him. Detective Pilarksi went to the Defendants' home and observed that there was no broken TV or TV on the ground.

On redirect examination, Detective Pilarski noted that there was no indication that N.L. had an abdominal injury before September 22, 2011. Additionally, he noted that the phone records from the Defendants' cell phone showed that someone called Southern

Hills Medical Center from that phone at 3:18 a.m., 3:42 a.m., and 4:00 a.m. on September 23, 2011.[2]

Doctor Deborah Lowen, a child abuse pediatrician at Vanderbilt Children's Hospital, testified that N.L. had just turned two years old when he was brought to the hospital. Dr. Lowen took photos of N.L.'s injuries, examined N.L., coordinated with his surgeons, and verified N.L.'s medical history with the nurse practitioner. At the time, N.L. was unable to speak because he was in a coma and on a ventilator. Southern Hills Medical Center had performed an emergency intubation on N.L. before transferring him to Vanderbilt Children's Hospital.

In reviewing N.L.'s medical history, Dr. Lowen did not notice any prior serious injuries. The records from Southern Hills Medical Center showed that N.L. was admitted at 5:25 a.m. on September 23, 2011. Lab reports showed that N.L. was "near death" when he was brought to Southern Hills. Dr. Lowen explained that the pH level in N.L.'s blood should have been 7.4 but his pH level was 6.6, which was an "almost not survivable level of acidity." N.L. had inadequate blood flow to many areas of his body, and his liver and pancreas function were "abnormal." N.L.'s blood pressure, after medication, was 65/32, a result of severe shock. N.L. was completely nonresponsive, his pupils were dilated, and his eyes were sunken. His heart rate was low, the blood flow to his skin and extremities was low, and he had bruises on his body. N.L. was also experiencing "agonal respirations," a condition where N.L. would take irregular, gasping breaths. Dr. Lowen explained that patients experiencing agonal respirations might take one to two breaths per minute. Conversely, a child breathing regularly would take twenty to twenty-four breaths per minute. She stated that it was not possible to tell how long N.L. had been experiencing agonal respirations but it was clear from his labs that N.L. had been in shock for "quite some time." Dr. Lowen opined that N.L. collapsed at Travel Lodge because he "didn't have enough blood pressure to stand up or function at all."

Dr. Lowen photographed the bruises on N.L.'s body, which were located on the back and side of N.L.'s left upper arm, his left thigh, right forearm near the wrist, the back of his right thigh, and the back of his knee. He also had a bite mark on his arm. Dr. Lowen could not determine when the bruises occurred and did not know whether the bruises were caused by a single or multiple instances of trauma. However, she stated that the bruises were not the type of injuries a child would sustain from "normal household play" because they were not located in places that are normally injured when children fall. Instead, the bruises "gave further concern about the possibility of abuse." Dr. Lowen also noted a bruise on N.L.'s lower back and stated that "truncal bruises [were]

_____

[2] The phone records for the Defendants' cell phone show that the calls to which Detective Pilarski was referring were "terminating" calls. The phone record lists calls as either "terminating" or "outgoing," but there is nothing in the record which explains what constitutes a "terminating" call.

relatively rare in typical accidental play, accidental falls, and play with siblings" and they were an additional cause for concern.

Dr. Lowen stated N.L. had also sustained internal injuries—his small intestine was perforated, his liver was lacerated, and his pancreas was injured. Based on the different locations of the injuries, Dr. Lowen opined that they were caused by multiple, direct blows to N.L.'s abdomen. Because of the force needed to inflict the injuries, Dr. Lowen did not believe that N.L. could have injured himself by running around the house or falling into an object or piece of furniture, and she stated that there was nothing in N.L.'s history that would provide an accidental cause for the injuries. Further, Dr. Lowen stated that N.L.'s injuries were not consistent with the reports that he fought with his four-year-old sister. However, they were consistent with an adult punching or kicking N.L. in the stomach or possibly throwing N.L. onto something that would push his abdomen in with enough force to crush his intestines against his spine.

When N.L. was taken into surgery, doctors discovered that he had "a massive amount of fluid" in his abdominal cavity. He also had a discharge that develops on an abdominal injury as it tries to heal itself. Based on the discharge, Dr. Lowen determined that the injury did not happen within the few hours before N.L. was brought to the hospital.

Dr. Lowen explained that, when a child sustains a perforation of their small intestine, they cannot eat normally. Therefore, because N.L.'s history showed that he ate normally at dinner on September 21, she concluded that he had not sustained the injury before then. However, Dr. Lowen stated that the symptoms N.L. experienced the next day—vomiting, lethargy, and refusal to eat—were exactly what she would expect from a patient with a perforated small intestine. Dr. Lowen explained that, immediately after N.L.'s small intestine was perforated, he would experience immediate and persistent abdominal pain and would vomit. While N.L. may have become thirsty due to dehydration, he would not have wanted to eat, and he would not have been able to keep anything down. Over time, N.L.'s symptoms would worsen, and his ability to stand and walk would diminish over the course of a couple of hours after the injury. Dr. Lowen recalled that Defendant Lopez reported that she had noticed that N.L.'s abdomen was "getting big." Dr. Lowen explained that a "rigid belly" was a symptom of inflammation in the lining of the abdomen that was caused by the contents of his intestines leaking into his abdominal cavity.

Dr. Lowen stated that it was very important that N.L. be taken for medical treatment for his injuries. Because such a long time had passed between N.L.'s initial injuries and the time he was brought to the hospital, N.L. sustained secondary brain injuries due to lack of blood flow and oxygen. Based on the severity of N.L.'s brain injuries, Dr. Lowen estimated that N.L. started sustaining the brain injuries more than an

hour before he was brought to Southern Hills Medical Center, but she could not give an exact time. However, she stated that the brain injury "definitely would have been avoided" if N.L. had been brought to the hospital on the day that he sustained the abdominal injury. Consequently, the brain injury was a direct result of the delay in seeking medical care. Dr. Lowen explained that N.L.'s condition could improve but his brain injury was permanent.

Based on the totality of N.L.'s injuries, Dr. Lowen concluded that N.L. was the victim of child physical abuse. Additionally, she concluded that medical neglect resulted in N.L.'s brain injury.

On cross-examination, Dr. Lowen explained that she could not determine when N.L. sustained the bruises because bruises heal at different rates based on the individual. She agreed that N.L.'s bruises could have been caused by fighting with his four-year-old sister. Dr. Lowen admitted that N.L.'s symptoms were similar to symptoms of viral illnesses, such as the flu or meningitis. Initially, a lay person may not have recognized the severity of N.L.'s injuries. However, at some point a "prudent caregiver" would think something else was wrong as N.L.'s symptoms progressed to recurrent vomiting, progressive lethargy, and falling down. Once N.L. started experiencing agonal respirations, it would have been clear to a lay person that they should seek medical care immediately. Dr. Lowen did not know how long N.L. had been experiencing agonal respirations before he was taken to Southern Hills Medical Center. Dr. Lowen agreed that, initially, it would have been rational for a person to treat N.L.'s symptoms with Pedialyte, nausea medication, Tylenol, and monitoring of the child. During redirect examination, Dr. Lowen explained that N.L.'s symptoms would have worsened throughout the day and, at some point, it would have become obvious to his caretaker that he needed medical attention, regardless of that caretaker's level of medical training or lack thereof.

Pedro Lopez, Defendant Lopez's father, testified that he lived with Defendant Lopez until August 2011 and that Defendant Gonzalez moved into their home in 2009. During the time Mr. Lopez lived in the home, he never observed any injuries or bruises on N.L. Mr. Lopez stated that he would occasionally take Defendant Lopez's children to the doctor for shots and checkups and once he took N.L. to an "audio therapist." Defendant Lopez would sometimes accompany them, and she always supported the children receiving medical treatment. Mr. Lopez provided financial support for Defendant Lopez, and on September 21 or 22, he wired her $3,000.

Defendant Lopez called Mr. Lopez eight times on the afternoon of September 22, although Mr. Lopez did not answer all of those calls. Mr. Lopez recalled that Defendant Lopez told him that N.L. was "really sick and throwing up" and that Defendant Lopez was going to buy N.L. some anti-vomiting medication and Pedialyte. Mr. Lopez advised

Defendant Lopez that she should take N.L. to the hospital. At 4:38 a.m.[3] on September 23, Defendant Lopez called Mr. Lopez again to inform him that N.L. had collapsed at Travel Lodge. Mr. Lopez told Defendant Lopez to take N.L. to the hospital. Mr. Lopez stated that Defendant Lopez never indicated whether N.L.'s stomach was rigid or firm and she did not tell Mr. Lopez how many times N.L. had vomited on September 22. She never described N.L. as lethargic, and she never described N.L.'s falling down.

On cross-examination, Mr. Lopez described N.L. as physically healthy and a "very active" child. Mr. Lopez also recalled that A.L. would often push N.L. and the two children would fight and hit each other. Prior to September 2011, N.L.'s doctors had never identified any abdominal bruises or injuries on N.L. Mr. Lopez recalled that N.L. and his siblings were loved; they were always clothed and fed, had a bed to sleep in, and had toys. Defendant Lopez would discipline the children by spanking them. Mr. Lopez recalled that Defendant Lopez dropped out of school when she was fourteen years old. Mr. Lopez stated that he thought Defendant Lopez was a good mother to her children; when she called Mr. Lopez, she sounded concerned about N.L.'s health. Mr. Lopez never observed either Defendant Lopez or Defendant Gonzalez hit the children outside of normal spanking.

On redirect examination, Mr. Lopez stated that Defendant Lopez was capable of recognizing when her children were in need of medical treatment and she was able to take them to the doctor on her own. Mr. Lopez also stated that he was present when a woman named Jacqueline[4] yelled at Defendant Gonzalez to "stop pushing [G.G., N.L.'s infant sister.]" Further, Mr. Lopez recalled that Defendant Gonzalez would cuss at the children in Spanish when he spanked them. Mr. Lopez explained that he thought cussing while spanking a child was abusive because the cussing would make the parent more angry.

After closing its case-in-chief, the State delivered an election of offenses, stating that Count 1 referred to Defendant Gonzalez "caus[ing] a liver laceration and a separate jejunal[5] tear to [N.L.] on September 22, 2011[]"; Count 2 referred to the same conduct and was presented as an alternative theory to Count 1; Count 3 referred to Defendants Gonzalez and Lopez's failure "to obtain appropriate medical care for [N.L.'s] worsening medical condition between September 22, 2011[,] and September 23, 2011[,] resulting in [N.L.] going into shock, collapsing, and suffering a separate hypoxic injury to his brain."

---

[3] Mr. Lopez was able to recall the exact times of the phone calls by referencing the phone records for the cell phone Defendant Lopez shared with Defendant Gonzalez. We note that the 4:38 a.m. phone call is labeled as a "terminating" call.

[4] Jacqueline's last name is not included in the record, so we must use her first name in this opinion. We intend no disrespect.

[5] The jejunum is a section of the small intestines.

Defendant Gonzalez testified that he dropped out of school in the tenth grade. At the time N.L. fell ill, Defendant Gonzalez was unemployed, so he watched the children while Defendant Lopez was at work. Defendant Gonzalez acted as a father figure to all the children and stated that he loved them. Defendant Gonzalez sometimes would discipline the children by spanking them with an open hand or a sandal or by making them sit on the couch. Defendant Gonzalez stated that he never injured the children when he spanked them and that he did not kick them. Defendant Gonzalez recalled that N.L. would often fight with A.L. and that she would sometimes bruise N.L. by throwing toys at him, biting him, and hitting him. Also, N.L. would often eat things he found on the floor, so Defendant Gonzalez tried to keep the house clean so that N.L. would not swallow something that would make him sick.

On September 22, 2011, Defendant Lopez was in her room, trying to sleep. N.L. woke up at around 8:00 a.m. and was running around the house. N.L. was trying to get into some cabinets in the kitchen and was trying to take food out of the refrigerator, so Defendant Gonzalez spanked N.L. "in the hip side of the buttocks area." Defendant Gonzalez admitted that he told Detective Pilarski that he spanked N.L. harder than normal that day, but Defendant Gonzalez explained that Detective Pilarski had used those words and Defendant Gonzalez had simply agreed with the statement. Defendant Gonzalez insisted that he did not hit N.L. hard enough to injure him and that he never intended to injure N.L. Defendant Gonzalez recalled that N.L. started crying after he spanked him, but he claimed that N.L. "would always cry like that when he couldn't do what he wanted." Defendant Gonzalez said he was not angry when he spanked N.L. on September 22, 2011.

After he spanked N.L., Defendant Gonzalez placed N.L. in the bedroom with Defendant Lopez and left to meet a lady from their church to pick up some mattresses. Defendant Gonzalez recalled that he left between 8:00 a.m. and 9:00 a.m., and he returned home around 1:30 p.m. When Defendant Gonzalez returned, he saw that N.L. was lying on the floor with vomit all over his clothes and that he was not running around like he normally did. Defendant Lopez told him that she did not know why N.L. was sick, but she believed that he may have eaten or drunk something out of the refrigerator that made him sick. Defendant Gonzalez was home for approximately ten to fifteen minutes, and when he left, N.L. still had not been cleaned up.

Defendant Gonzalez took his mother's truck to the mechanic and then returned the truck to his mother's house. He stayed at his mother's house until 4:00 p.m. or 5:00 p.m., when Mr. Lopez called him to tell him that he had wired some money to a Western Union in Wal-Mart. Defendant Gonzalez returned home at 5:30 p.m., and N.L.'s condition appeared to be the same as it had been at 1:30 p.m. Defendant Gonzalez asked Defendant Lopez about N.L.'s condition, and Defendant Lopez told him that N.L. was constipated.

Around 6:00 p.m., both Defendants took the children to Wal-Mart to pick up the money Mr. Lopez had sent to them. After that, they went to Burger King to try to get N.L. to eat some food. N.L. tried to drink some of the juice they bought for him, but he vomited it up. At that point, Defendant Gonzalez told Defendant Lopez that he thought they should take N.L. to the hospital. However, from Burger King, the Defendants went to Defendant Gonzalez's mother's house to pay her some money they owed her and then went to Walgreens to buy N.L. some Pedialyte and liquid Tylenol. After that, they went to a store to buy food for dinner. When they returned home, Defendant Lopez put some Tylenol drops into N.L.'s Pedialyte. N.L. drank it and began to look better, but shortly after drinking the Pedialyte, he vomited it up. At this point, Defendant Gonzalez again suggested that they take N.L. to the hospital. Instead, Defendant Lopez decided to take N.L. to work with her so that she could watch him and take him to the hospital if his condition worsened. She went to work around 8:00 p.m. or 9:00 p.m. Defendant Gonzalez stated that he trusted Defendant Lopez's judgment because she was N.L.'s mother.

Defendant Lopez called Defendant Gonzalez several times during the night with updates on N.L.'s condition. She told Defendant Gonzalez that she had given N.L. some medicine and that he was starting to look better. However, Defendant Lopez called again to tell Defendant Gonzalez that she had taken N.L. to Southern Hills Medical Center because N.L.'s condition had gotten worse. Later, Defendant Lopez called Defendant Gonzalez to tell him that N.L. was being transported to Vanderbilt and that she would pick up Defendant Gonzalez on her way to Vanderbilt.

On cross-examination, Defendant Gonzalez stated that he was did not cause the injuries to N.L. Defendant Gonzalez denied ever having lied about the events on September 22, 2011. He stated that he could not remember whether he had possession of the Defendants' shared cell phone the night Defendant Lopez took N.L. to work with her. However, he clearly remembered Defendant Lopez calling him from Travel Lodge with updates on N.L.'s condition and then calling him again from Southern Hills Medical Center to tell him that N.L. was being transported to Vanderbilt Children's Hospital. Defendant Gonzalez explained that he suggested taking N.L. to the hospital several times because N.L. kept vomiting the medicine they were giving him. However, Defendant Lopez made the decision not to take N.L. to the hospital. Defendant Gonzalez never observed N.L. fall down on September 22, and the only time he heard of N.L.'s falling was when he collapsed at Travel Lodge.

Defendant Gonzalez stated that he did not know who had injured N.L. because he was not in the house when it happened. Defendant Gonzalez acknowledged that he was the only person who had admitted to hitting N.L. on September 22, and he admitted that he told Detective Pilarski that he had struck N.L. on the side. However, he maintained

that he was trying to tell Detective Pilarski that he had spanked N.L. on the backside. Defendant Gonzalez claimed that he did not understand everything during his conversation with Detective Pilarski because they were speaking in English at the time and Detective Pilarksi would not let Defendant Gonzalez finish explaining "how everything happened."

After deliberation, the jury was unable to reach a verdict for Count 1, and the trial court declared a mistrial as to that count of the indictment. In Count 2, the jury found Defendant Gonzalez guilty of aggravated child neglect. In Count 3, the jury found both Defendant Gonzalez and Defendant Lopez guilty of aggravated child neglect.

*Sentencing Hearing*

Michelle Hendricks testified that she was the foster mother to N.L. and his two sisters, A.L. and G.G., and that she was currently in the process of adopting them. A.L. and G.G. came to live with Ms. Hendricks in September 2011, and N.L. came into her home when he was released from the hospital in October 2011. Shortly after the girls came to live with Ms. Hendricks, A.L. told her about times when Defendant Lopez and Defendant Gonzalez would fight. At times, A.L. tried to stop the fighting, and she indicated that, on at least one occasion, someone called the police. A.L. also described situations where she and N.L. had been kicked, hit, and had shoes thrown at them. She also described being "choked out" by someone who put their fingers around her neck until she went to sleep. A.L. stated that "a lot of things didn't happen to [G.G.]" because she was a baby. Ms. Hendricks described A.L. as being very withdrawn about these events and recalled that A.L. did not speak about the events with any emotion. When A.L. first came to live with Ms. Hendricks, she had symptoms of trauma and was enrolled in Centerstone for Post-Traumatic Stress Disorder. After she had completed that program, A.L. participated in therapy at the Child Advocacy Center. Ms. Hendricks stated that A.L. still struggled with some residual effects from her experience, but she noted that A.L. was becoming less withdrawn and no longer flinched whenever someone reached toward her face or moved quickly toward her.

N.L. came into Ms. Hendricks home after he was released from the hospital. Eventually, his condition improved to the point where he was able to enroll in therapeutic day care, where he received occupational therapy, physical therapy, and speech therapy. Ms. Hendricks worked in tandem with N.L.'s therapists to continue his treatment at home. Mr. Hendricks explained that N.L. required such therapy because he had sustained severe cognitive and physical damage as a result of his injuries. He had to learn how to walk again and had to develop his speech again. Ms. Hendricks recalled that, initially, she had to watch N.L. very carefully because he had what was called "drunk man syndrome," which compromised his sense of balance and caused him to stumble. Also, when N.L. was released from the hospital he was paralyzed on his left side. With

treatment, N.L.'s balance had improved, and he had regained full use of the left side of his body. However, N.L. still had frontal lobe damage and memory issues, and he was enrolled in a full-time special education class. Ms. Hendricks stated that she hoped N.L. would be able to progress out of the special education program, but there was no indication that such goal would happen in the near future. N.L. continued to see a neurologist, but the doctor could not tell how much N.L.'s brain injury would impact his life in the future.

Ms. Hendricks reported that N.L. underwent additional surgeries for his physical injuries since he was released from the hospital. During N.L.'s initial surgery in September 2011, part of his lower bowel had to be removed because it had decayed. N.L. had to undergo another surgery in 2013 because scar tissue from the initial surgery was blocking his bowel, preventing him from passing anything or keeping anything down. N.L.'s doctors told Ms. Hendricks that it was not uncommon for children who suffered abdominal injuries to have to undergo corrective surgery as they grow. Also, N.L. had suffered a fall, which required corrective surgery. Ms. Hendricks anticipated that she would have to continue to provide N.L. with specialized care throughout his juvenile years. She explained that he would struggle in school and with cognitive activities for the rest of his life.

Defendant Gonzalez testified that he wished "none of this had happened." He stated that he did not intend to harm N.L. in any way and that "even though [he] whipped [N.L.], [he] never thought that all of this would happen to [N.L.]." Defendant Gonzalez confirmed he was a legal resident of the United States, but he explained that "there [was] a good chance" that his immigration status would be revoked and he would be deported back to El Salvador as a result of his convictions. Defendant Gonzalez acknowledged that he had two prior convictions for violation of the driver's license law and one conviction for criminal trespass. However, aside from those three convictions, he had never been in trouble. He stated that he had never been charged with assault or any violent crime. Defendant Gonzalez told the court that he felt that he deserved a second opportunity. He noted that his mother and siblings were present in court to support him, and he stated that he was going to do whatever he could to regain custody of his daughter, G.G.

On cross-examination, Defendant Gonzalez maintained that he only spanked N.L. once and that he spanked him "softly." He said he was sorry N.L. was injured, but he denied causing the injuries. He claimed he would never have done what he was accused of and that he did not know who injured N.L. because he was not at home at the time. He denied that he or Defendant Lopez ever kicked, hit, choked, or threw things at A.L. or N.L. However, Defendant Gonzalez stated that he was not accusing A.L. of making up the things she told Ms. Hendricks. He noted that Defendant Lopez's father also lived in

the house but said he was not accusing Mr. Lopez of abusing the children. Defendant Gonzalez denied ever having a physical altercation with Defendant Lopez and claimed that "[t]here was never violence in the house." When asked if Defendant Lopez was lying when she told the presentence report investigator that there was domestic violence in the home, Defendant Gonzalez stated, "Well, I don't know what she may have told that person, I can't." Defendant Gonzalez explained that he thought he deserved a second chance "[b]ecause [he] didn't do those things to [N.L.] that caused those injuries."

Defendant Lopez stated that she was nineteen years old at the time N.L. fell ill and that she had dropped out of school in the ninth grade. She was raising three children and had maintained employment. She always made sure her children were fed, clothed, and had a place to live. When N.L. began to show symptoms, her first instinct was to medicate him. At the time, she was doing everything she knew how to do to help N.L. She thought he had a virus, and she had no idea that the delay in taking N.L. to the hospital would cause permanent injuries.

On cross-examination, Defendant Lopez stated that there were instances of domestic violence in the household "a couple of times a week" and that Defendant Gonzalez was the primary aggressor. The violence would often occur when the children were present in the home, and the children witnessed some of the incidents. However, Defendant Lopez said A.L. never tried to intervene. Also, she claimed that N.L. only had one bruise when he was taken to the hospital. Even though she had been in the courtroom during Ms. Hendrick's testimony, Defendant Lopez denied hearing A.L.'s statements that she and N.L. were hit, kicked, and choked while they lived in the home.

In a written sentencing order, the trial court noted the testimony from the sentencing hearing and "fully credit[ed]" Ms. Hendrick's testimony. Conversely, the trial court found that Defendant Gonzalez's testimony was "self-serving and his credibility questionable at best" and that Defendant Lopez did not provide a satisfactory explanation for why she waited to take N.L. to the hospital.

The trial court found that two enhancement factors applied to Defendant Gonzalez. First, Defendant Gonzalez had "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range" based on the testimony from Ms. Hendricks and Defendant Lopez about domestic violence. However, the court stated that it was not giving great weight to Ms. Hendrick's hearsay testimony about the violence in the home. Instead, the trial court relied on details of Defendant Gonzalez's violent behavior that were included in the presentence report. The trial court also acknowledged that Defendant Gonzalez did not have any other prior criminal history apart from his two driving violations and conviction for criminal trespass. Second, the trial court found that Defendant Gonzalez abused a position of private trust because he acted as N.L.'s father figure. The trial court applied Defendant Gonzalez's legal

- 14 -

immigration status as a mitigating factor but gave it "very little weight." The trial court also considered the discretionary consecutive sentencing factors and found that consecutive sentences were warranted based on the fact that Defendant Gonzalez was "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high."

Consequently, the trial court ordered consecutive sentences of twenty years for Count 2 and fifteen years for Count 3 for an effective thirty-five-year sentence. The trial court stated that "this aggregate sentence is the minimum sentence necessary to reflect the severity of the offenses committed and to protect the public."

As to Defendant Lopez's sentence, the trial court found that the same two enhancement factors applied to her conviction. First, she had "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range." The trial court noted that, while Defendant Lopez had a juvenile record, none of her prior offenses would have been felonies if she were tried as an adult. However, the trial court noted that Defendant Lopez had one prior conviction for a driving offense and that she admitted in the presentence report to using cocaine and marijuana in the past. Second, the trial court found that Defendant Lopez abused a position of private trust when she delayed in seeking medical care for N.L. As to mitigating factors, the trial court noted that Defendant Lopez was less culpable than Defendant Gonzalez and that she had been victimized in the past. After weighing the factors, the trial court sentenced Defendant Lopez to seventeen years for her conviction in Count 3.

The Defendants filed timely motions for new trial, which were denied. Their timely appeals followed.

## Analysis

### *Defendant Gonzalez's Motion to Suppress*

Defendant Gonzalez contends that, because English is not his first language, he did not knowingly and voluntarily waive his rights under Miranda v. Arizona, 384 U.S. 436 (1966), when Detective Pilarksi read the waiver form in English. Defendant Gonzalez acknowledges that Detective Pilarski offered to have the Miranda waiver form translated into Spanish, but Defendant Gonzalez argues that Detective Pilarksi "never waited for an affirmative or negative response from [Defendant Gonzalez] regarding his understanding of those rights and the consequence of waiving them." The State argues that Detective Pilarksi's previous interview with Defendant Gonzalez showed that Defendant Gonzalez had no difficulties understanding and communicating in English

and, therefore, Defendant Gonzalez's waiver of his <u>Miranda</u> rights was valid. We agree with the State.

Prior to trial, Defendant Gonzalez filed a motion to suppress his audio-recorded statement based on a claim that he did not knowingly waive his <u>Miranda</u> rights, even though the waiver form was signed by him. Specifically, Defendant Gonzalez asserted that his primary language was Spanish and, even though Detective Pilarski offered to have someone translate the <u>Miranda</u> waiver, he never waited for Defendant Gonzalez to answer whether he wanted a translator. Defendant Gonzalez argued that Detective Pilarski should have made more of an effort to ensure that Defendant Gonzalez understood the rights he was waiving.

At the motion to suppress hearing, Detective Pilarski testified that he interviewed Defendant Gonzalez on September 23, 2011, at Vanderbilt Hospital. That interview lasted at least an hour, and Defendant Gonzalez spoke with Detective Pilarski in English. Detective Pilarski noted that Defendant Gonzalez spoke English "fairly well" and that he did not recall experiencing any difficulties communicating with Defendant Gonzalez. After the interview, Defendant Gonzalez was taken into custody.

Detective Pilarski interviewed Defendant Gonzalez again on September 27, 2011. At that time, Detective Pilarski advised Defendant Gonzalez of his <u>Miranda</u> rights by reading a <u>Miranda</u> Rights Waiver form in English. Detective Pilarski reported that he did not use a translator when speaking with Defendant Gonzalez but recalled that Defendant Gonzalez did not experience any difficulty communicating in English in his prior interview. Defendant Gonzalez signed the <u>Miranda</u> rights waiver form at the beginning of the September 27, 2011 interview.

On cross-examination, Detective Pilarski stated that he offered to have the <u>Miranda</u> rights read in Spanish[6] but Defendant Gonzalez declined. Detective Pilarski did not offer to have an interpreter in the interview because he knew from the September 23, 2011 interview that Defendant Gonzalez spoke and understood English. Detective Pilarski also admitted that, before Defendant Gonzalez signed the <u>Miranda</u> waiver form, he asked what Detective Pilarski wanted to discuss and Detective Pilarski responded that he wanted to talk about N.L.

The trial court noted from the bench that Defendant Gonzalez appeared to be nervous and uncomfortable when he signed the <u>Miranda</u> waiver, but the court also said

---

[6] It is not clear from Detective Pilarksi's testimony whether he offered to have someone read the <u>Miranda</u> waiver form in Spanish or whether he offered to provide Defendant Gonzalez with a form that was written in Spanish. However, the video recording of the interview clearly shows that Detective Pilarski offered to have someone read the form in Spanish.

that any person would experience some degree of nervousness and discomfort before a police interrogation. In a written order, the trial court accredited Detective Pilarski's testimony and accepted the detective's conclusion that "there was no communication issue between [Detective Pilarski] and [Defendant Gonzalez]." Detective Pilarski clearly offered to have the <u>Miranda</u> waiver form read in Spanish, and even though Defendant Gonzalez never verbally refused the offer, the trial court found that the Defendant "freely chose to proceed" without having his rights translated into Spanish. Additionally, the trial court specifically rejected Defendant Gonzalez's claim that he did not understand the <u>Miranda</u> rights due to a language barrier. The court noted that it was clear Defendant Gonzalez spoke English proficiently because at no point during "the very lengthy interview" did it appear that Defendant Gonzalez had difficulty understanding or communicating with Detective Pilarski.

The applicable standard of review for suppression issues is well-established. A trial court's findings of fact are binding on this court unless the evidence in the record preponderates against them. <u>State v. Echols</u>, 382 S.W.3d 266, 277 (Tenn. 2012) (citing <u>State v. Odom</u>, 928 S.W.2d 18, 23 (Tenn. 1996)). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." <u>Id.</u> The prevailing party is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing and all reasonable and legitimate inferences that may be drawn therefrom. <u>Id.</u> The trial court's application of law to the facts is reviewed under a de novo standard with no presumption of correctness. <u>Id.</u> (citing <u>State v. Walton</u>, 41 S.W.3d 75, 81 (Tenn. 2001)). When reviewing a trial court's ruling on a motion to suppress, this court may consider the entire record, including the proof presented at the suppression hearing as well as at trial. <u>State v. Thacker</u>, 164 S.W.3d 208, 248 (Tenn. 2005); <u>State v. Walton</u>, 41 S.W.3d 75, 81 (Tenn. 2001); <u>State v. Henning</u>, 975 S.W.2d 290, 297-99 (Tenn. 1998).

Both the United States and Tennessee Constitutions protect against compelled self-incrimination. U.S. Const. amend. V; Tenn. Const. art. I, § 9. In order to protect criminal defendants from self-incrimination, the United States Supreme Court has ruled that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of a defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." <u>Miranda</u>, 384 U.S. at 444; <u>Walton</u>, 41 S.W.3d at 82. As part of those safeguards, police are required to inform persons who are subjected to custodial interrogation: "(1) that they have the right to remain silent; (2) that any statement made may be used as evidence against them; (3) that they have the right to the presence of an attorney during questioning; and (4) that if they cannot afford an attorney, one will be appointed for them prior to questioning, if so desired." <u>Miranda</u>, 384 U.S. 444. The requirement of the

<u>Miranda</u> warnings "must be strictly enforced, but only in those situations in which the concerns that motivated the decision are implicated." <u>State v. Goss</u>, 995 S.W.2d 617, 629 (Tenn. 1998) (citing <u>Illinois v. Perkins</u>, 496 U.S. 294, 296 (1990)).

A defendant may waive his rights under <u>Miranda</u> if such waiver is voluntary, knowing, and intelligent. <u>State v. Echols</u>, 382 S.W.3d 266, 280 (Tenn. 2012). To determine whether a defendant waived his rights voluntarily, knowingly, and intelligently, courts must look at the totality of the circumstances. <u>Id.</u> Relevant factors include:

> the age and background of the defendant; his education and intelligence level; his reading and writing skills; his demeanor and responsiveness to questions; his prior experience with the police; any mental disease or disorder; any intoxication at the time of the waiver; and the manner, detail, and language in which the <u>Miranda</u> rights were explained.

<u>Id.</u> 280-81.

In this case, neither party disputes the fact that Defendant Gonzalez's September 27, 2011 interview was a custodial interrogation. Instead, Defendant Gonzalez contends that the waiver of his <u>Miranda</u> rights was not voluntary, knowing, and intelligent. The record clearly shows that Detective Pilarski interviewed Defendant Gonzalez at the hospital for at least an hour in English. During that interview, Detective Pilarski did not have any trouble communicating with Defendant Gonzalez. Further, the lengthy September 27, 2011, interview was conducted in English, and Defendant Gonzalez did not appear to have trouble understanding Detective Pilarski. Even though Detective Pilarski offered to have the form read in Spanish, a review of the video from the September 27, 2011 interview shows that Defendant Gonzalez made no indication that he did not understand the waiver form before he signed it. While Defendant Gonzalez did not specifically accept or reject Detective Pilarski's offer to have the form read in Spanish, we agree with the trial court's conclusion that Defendant Gonzalez "freely chose to proceed" without a Spanish translation of the <u>Miranda</u> rights. The trial court properly determined that Defendant Gonzalez understood his <u>Miranda</u> rights as they were read in English and that he voluntarily, knowingly, and intelligently waived those rights. He is not entitled to relief.

*Photos of N.L.'s Bruises*

Next, Defendant Gonzalez argues that the trial court erred when it allowed the State to introduce photos of N.L.'s bruises. He contends that the photos were not relevant because they did not relate to N.L.'s abdominal injuries and the bruises were not attributable to Defendant Gonzalez. Additionally, Defendant Gonzalez claims that the

photos' prejudicial impact outweighed their probative value. The State argues that the photos were relevant for the jury to evaluate Dr. Lowen's testimony and to determine whether the Defendants should have noticed the bruises and suspected that N.L.'s condition was caused by something other than a virus. Further, the State contends that the photos carried "very little danger of unfair prejudice." We agree with the State.

Prior to trial, Defendant Gonzalez argued that photos of N.L.'s bruises were not probative evidence of N.L.'s abdominal injuries. The State argued that the photos of the bruises indicated a repetitive pattern of trauma, which suggested that N.L.'s injuries were caused by something other than by accidental means. Further, the State claimed that the bruises rebutted Defendant Gonzalez's claim that he only struck N.L. one time and not very hard. Finally, the State contended that, because the bruises were located on readily observable places on N.L.'s body, Defendants Gonzalez and Lopez would have seen them and known that N.L. needed medical attention. The trial court found that the photos were relevant to the case and allowed them to be used during Dr. Lowen's direct examination.

In order to be admitted into evidence, a photograph must be relevant to an issue that the jury must decide. State v. Thomas, 158 S.W.3d 361, 394 (Tenn. 2005); see also Tenn. R. Evid. 402. "[E]vidence is relevant if it helps the trier of fact resolve an issue of fact." State v. James, 81 S.W.3d 751, 757 (Tenn. 2002) (quoting Neil P. Cohen, et al., Tennessee Law of Evidence § 4.01[4], at 4-8 (4th ed. 2000)); see also Tenn. R. Evid. 401. However, Rule 403 of the Tennessee Rules of Evidence provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "Unfair prejudice" is defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Advisory Committee Note to Federal Rule of Evidence 403). "[T]he admissibility of photographs lies within the discretion of the trial court," whose ruling "will not be overturned on appeal except upon a clear showing of an abuse of discretion." Id. at 949.

In this case, Dr. Lowen testified as to the location of N.L.'s bruises and stated that they were not the type of bruises that resulted from normal household play because they were not located on parts of the body that are hit during such activity. Further, the photographs were relevant to the question of whether Defendant Gonzalez had abused N.L. and whether either Defendant should have suspected that N.L.'s condition resulted from something other than a virus. The photos depict close-up views of the bruises on N.L.'s body and are not particularly graphic or gruesome. Accordingly, the photos'

probative value was not outweighed by any unfair prejudice. The trial court did not abuse its discretion when it allowed the State to introduce the photos into evidence.

*Impeachment Evidence*

Defendant Gonzalez also argues that the trial court erred when it denied his attempt to impeach Detective Pilarski with extrinsic evidence from Detective Pilarski's personnel file showing that the detective previously had been reprimanded. The State argues that the trial court correctly found that the evidence was not probative of Detective Pilarski's character for truthfulness.

In a jury-out hearing, Defendant Gonzalez argued that he should be able to impeach Detective Pilarski's testimony with excerpts from his personnel file. In an offer of proof, Detective Pilarski testified that he had previously been disciplined for failure to adhere to the policy and rules for writing police reports. He explained that he had arrested an individual who had admitted to swallowing a small amount of cocaine and another officer helped Detective Pilarski fill out the paperwork associated with the arrest. The night of the arrest, Detective Pilarski filled out the arrest report, which included the detail that the arrestee had swallowed a small amount of cocaine, and the other officer wrote the offense report. However, when Detective Pilarski reviewed the offense report, he noted that it was "not correct." Detective Pilarski rewrote the offense report, excluding the detail that the arrestee had swallowed some cocaine and discarded the other officer's original offense report. Ultimately, Detective Pilarski was questioned as to why he threw away the original offense report, and he was disciplined because he had not included everything in the rewritten offense report that he had included in the arrest report. Detective Pilarski explained that he was not disciplined for dishonest conduct but simply because he did not put all the necessary information into the offense report. Detective Pilarski could not remember whether the report that he discarded included information about the arrestee swallowing cocaine.

The trial court noted that the documents from Detective Pilarski's personnel file would not be admissible impeachment evidence because Tennessee Rule of Evidence 608(b) does not allow extrinsic evidence to be admitted to prove specific instances of conduct. Further, the trial court found that testimony about the reprimand could not be used to impeach Detective Pilarski because it did not go to Detective Pilarski's character for truthfulness. Additionally, the trial court found that any possible relevance would be outweighed by the danger of unfair prejudice.

"Tennessee Rule of Evidence 608(b) provides that specific instances of conduct may be used to impeach a witness during cross-examination if the conduct is probative of the witness's character for truthfulness or untruthfulness." State v. Julio Ramirez, No. M2009-01617-CCA-R3-CD, 2011 WL 2348464, at *13 (Tenn. Crim. App. Jun. 8, 2011),

perm. app. denied (Tenn. Sept. 21, 2011). Before a witness may be cross-examined on specific instances of conduct, the trial court must, upon request, hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry. Tenn. R. Evid. 608(b)(1). However, "[i]f the witness denies the conduct, the party proffering the evidence must be satisfied with that response and may not seek to prove the conduct by extrinsic evidence." Julio Ramirez, 2011 WL 2348464, at *13; Tenn. R. Evid. 608(b). When the trial court complies with the procedural requirements of Rule 608(b), we review the trial court's decision under an abuse of discretion standard. Julio Ramirez, 2011 WL 2348464, at *14.

In this case, it is not clear from Defendant Gonzalez's brief whether he argues that the trial court erred by not allowing him to use extrinsic evidence as proof of the reprimand or that the trial court improperly restricted him from cross-examining Detective Pilarski about his reprimand. Initially, we note that Defendant Gonzalez could not have used extrinsic evidence to impeach Detective Pilarski's testimony. Rule 608(b) explicitly states that specific instances of conduct may not be proven by extrinsic evidence, unless the specific instance of conduct is a prior conviction for a crime as provided in Tennessee Rule of Evidence 609. Tenn. R. Evid. 608(b). A job-related reprimand is not a prior conviction for a crime. Therefore, Defendant Gonzalez would not have been allowed to introduce extrinsic evidence of the reprimand even if the trial court had allowed him to ask Detective Pilarski about the reprimand.

Further, we do not believe the trial court abused its discretion when it ruled that Detective Pilarski's reprimand was not relevant to his character for truthfulness or untruthfulness. Detective Pilarski explained that he was reprimanded because he failed to follow department policies which required him to include all of the information from the arrest report in the offense report, not because of any dishonest conduct. Moreover, Detective Pilarksi included the detail about the arrestee swallowing the package of cocaine in his arrest report, which was completed at roughly the same time as the offense report. Accordingly, we conclude that the trial court did not abuse its discretion when it determined that the reprimand in Detective Pilarski's personnel file was not probative of his character for truthfulness or untruthfulness. Defendant Gonzalez is not entitled to relief on this issue.

*Improper Prosecutorial Comments*

Defendant Lopez argues that her right to a fair trial was violated when the prosecutor expressed his personal belief or opinion as to Defendant's Lopez's guilt and intentionally mislead the jury as to the inferences it could draw by mischaracterizing Defendant Lopez's defense. The State argues that the prosecutor was responding to Defendant Lopez's argument and did not commit misconduct during closing argument.

In his opening statement, Defendant Lopez's counsel described Defendant Lopez as a loving mother who had been "nothing but vigilant about [N.L.]" He also noted that Defendant Lopez was the sole wage earner, supporting Defendant Gonzalez and her three children. At the end of his opening statement, Defendant Lopez's counsel made the following remark:

> Ladies and gentlemen, we are born into this world and our circumstances are our circumstances, but to be told that you didn't do enough when you were doing everything you could, that goes beyond the pale.

Then, during the State's initial closing argument, the following exchange occurred:

> [THE STATE]: The defendants don't claim that they are guilty of less serious crimes. They walked into this courtroom, they entered pleas of not guilty, and you heard [Defendant] Gonzalez take the stand and say, yesterday, ["]I'm not guilty of anything. I'm falsely accused. I shouldn't even be here.["] You heard [Defendant] Lopez'[s] lawyer say this is a joke that she is indicted for these offenses.

> [DEFENDANT LOPEZ'S COUNSEL]: Objection. That misstates any testimony whatsoever.

> THE COURT: The jury heard that. I don't know whether that was said or not, but the jury can consider that. This is argument. This is not proof, but if that was said and the jury have [sic] found what he said to be correct, if not, then that is your decision.

> [THE STATE]: I will put up [Defendant Lopez's counsel's] quote in just a few minutes.

Later in its initial closing argument, the State referred to Defendant Lopez's counsel's opening statement and said:

> According to [Defendant Lopez's counsel], "[Defendant] Lopez rushed [N.L.] to the hospital just like any other mother would do." "What more could she have done," he told you, and then "this goes beyond the pale to be told that she is guilty of neglect." In other words, the State charging her, her being arrested for neglect, goes beyond the pale.

> Well, if you think we are doing the wrong thing by indicting these defendants, by bringing this case before the jury, then by all means send

that message through your verdict, but I don't think that you are going to look at this evidence and draw that conclusion.

The State then went on to summarize the testimony presented at trial.

During his closing argument, Defendant Lopez's counsel made the following statement:

> . . . I want to start by addressing something that was said in the district attorney's close. He said that I called this a joke. I'm sorry he said that. I didn't say that. He said he was going to show you my quote. That quote did not say that I called this a joke. I've checked with the court reporter, I never used that word. It's offensive and it strikes at the very heart of who I am. I'm a father. I'm an officer of this court and that is offensive, so I apologize that he did that.
>
> I didn't say that and this isn't a joke. I'm defending this woman's life. There is nothing funny about that, nothing at all. I've lived with this case for so long, I'm sorry he said that, that's not true.

During the State's final closing argument, the prosecutor made the following comment:

> I'm not going to apologize to [Defendant Lopez's counsel] for my comment about a joke, because a joke in the context that I used is not something that's funny, in the context in which he refers to our conduct in prosecuting his client is that we are irresponsible. The detectives are irresponsible. His client, again, did no wrong and therefore it's a joke to proceed against her.
>
> It's not a laughing matter[,] and we think very long and very hard and very carefully about who we are going to bring to court, because we know that we have to convince [twelve] people of what we are alleging. The burden is on us. In the reality of my world the reality of the kinds of cases that I prosecute is a very simple one, good people do bad things a lot. Loving and caring parents cross over the line and kids get injured and sometimes die a lot.

In the order denying Defendant Lopez's motion for new trial, the trial court found that the prosecutor's comments were "acceptable argument" because one definition of "joke" was "something not to be taken seriously." Further, the trial court found that,

even if the remark was improper, it was not so prejudicial as to invalidate Defendant Lopez's conviction.

Closing argument "is a valuable privilege that should not be unduly restricted." State v. Smith, 527 S.W.2d 737, 739 (Tenn. 1975). Attorneys are given wide latitude when arguing before the jury, and the trial court has broad discretion in controlling their arguments, which will be reversed only upon an abuse of discretion. State v. Thomas, 158 S.W.3d 361, 412-13 (Tenn. 2005). "However, closing argument must be temperate, must be predicated on evidence introduced during the trial of the case and must be pertinent to the issues being tried." Id. at 413. The State is more limited in what it may argue because it must seek justice as opposed to merely advocate. Id. We have recognized five general areas of prosecutorial misconduct in closing argument: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or as to the defendant's guilt; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting broader issues other than guilt or innocence of the defendant; and (5) arguing or referring to facts outside the record unless such facts are matter of common public knowledge. State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

Improper argument constitutes reversible error if "the conduct was so improper or the argument so inflammatory that it affected the verdict to the [defendant's] detriment." Id. at 5. To determine the prejudicial impact of any misconduct, this court should consider: (1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength and weakness of the case. Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

In this case, although the comments of both attorneys were immature and unnecessary, we are unable to conclude that the prosecutor's statements rose to the level of prosecutorial misconduct as described in Goltz. As the trial court noted, Merriam-Webster's Dictionary defines "joke" as (1) "something said or done to provoke laughter" or (2) "something not to be taken seriously." While Defendant Lopez's counsel did not use the term "joke" in his opening argument, he did say that the charges brought against Defendant Lopez were "beyond the pale," implying that it was ridiculous to charge Defendant Lopez in light of her circumstances. In his rebuttal argument, the prosecutor clarified that it used the word "joke" to illustrate Defendant Lopez's counsel's view that the decision to charge Defendant Lopez was irresponsible and not taken seriously—he did not use the term to imply that the charges were in any way humorous. Therefore, we cannot conclude that the prosecutor mislead the jury by mischaracterizing the remarks of

Defendant Lopez's counsel. Further, we do not believe the prosecutor's comments expressed the prosecutor's personal beliefs about Defendant Lopez's guilt or innocence. In fact, the prosecutor invited the jury to return a verdict of not guilty if, after looking at the evidence in the record, it believed that Defendant Lopez should not have been charged. Although he did express doubt that the jury would acquit Defendant Lopez, his statement was based on the evidence presented at trial, not his personal opinion.

Even if the prosecutor's comments were improper, we do not believe that the comments were "so improper . . . or inflammatory that it affect the verdict to the [defendant's] detriment." See Goltz, 111 S.W.3d at 5. In response to Defendant Lopez's objection, the trial court noted that arguments were not evidence, and the trial court instructed the jury during the jury charge that "[s]tatements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence." Moreover, Dr. Lowen described the severe injuries N.L. suffered as well as the force necessary to inflict those injuries. Additionally, she testified that, while N.L.'s symptoms may have mimicked viral symptoms initially, eventually his condition would have worsened throughout the day to the point where any prudent caregiver would have known that medical attention was necessary, regardless of that person's level of medical knowledge. Accordingly, in light of such evidence, we conclude that any error in the prosecutor's closing argument was harmless, and Defendant Lopez is not entitled to relief.

*Sufficiency of the Evidence*

Both Defendants challenge the sufficiency of the evidence supporting their convictions. Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978), superseded on other grounds by Tenn. R. Crim. P. 33 as stated in State v. Moats, 906 S.W.2d 431, 434 n.1 (Tenn. 1995). This court will not reweigh the evidence. Id. Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. Bland, 958 S.W.2d at 659; Tuggle,

639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

A person commits child neglect when that person "knowingly abuses or neglects a child under eighteen (18) years of age so as to adversely affect the child's health and welfare[.]" Tenn. Code Ann. § 39-15-401(b) (Supp. 2011). As charged in the indictment, "[a] person commits the offense of . . . aggravated child neglect . . . who commits . . . child neglect, as defined in § 39-15-401(b) . . . and: (1) [t]he act of . . . neglect . . . results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a)(1) (Supp. 2011). If the victim is under the age of eight years old, aggravated child neglect is a Class A felony. Tenn. Code Ann. § 39-15-402(b) (Supp. 2011).

In short, child neglect is composed of three essential elements: "(1) a person knowingly must neglect a child; (2) the child's age must be within the applicable range set forth in the statute; and (3) the neglect must adversely affect the child's health and welfare." State v. Sherman, 266 S.W.3d 395, 404 (Tenn. 2008). In order to establish neglect, the State must first show that a defendant owed a legal duty to the child. Id. A defendant may be subject to criminal liability for child neglect when the defendant stands *in loco parentis* to the child. Id. at 405. A person stands *in loco parentis* when that person assumes the full responsibilities of a parent. Id. at 406 (citing Norton v. Ailor, 124 Tenn. 563, 566 (1883) (stating that when a stepfather admits a child into his household, he assumes "the obligation of the father as respects the support of his minor child")).

Further, child neglect is a nature-of-conduct offense, not a result-of-conduct offense. State v. Ducker, 27 S.W.3d 889, 897 (Tenn. 2000). The statute merely requires that the act of neglecting the child must be knowing. Id. By way of illustration, a defendant satisfies the *mens rea* for child neglect when he or she knowingly leaves a child in a car for more than eight hours, but the *mens rea* requirement is not satisfied if he or she was unaware the child was present in the car at the time. Id. After the knowing *mens rea* is established, then the next inquiry is whether the child suffered an adverse effect to the child's health or welfare. Id. If the child has suffered an adverse health effect as a result of defendant's knowing neglect, then the defendant has committed child neglect, regardless of whether the defendant knew what the result of the neglect would be. Id.

### a. Defendant Gonzalez

Defendant Gonzalez argues that the State failed to establish the requisite *mens rea* to convict him of aggravated child neglect. Specifically, he contends that, because the State could not attribute N.L.'s bruises to Defendant Gonzalez's conduct, evidence of

N.L.'s bruises was insufficient to show that Defendant Gonzalez knew or should have known that his conduct would result in serious bodily injury to N.L. Defendant Gonzalez was convicted of two counts of aggravated child neglect—the first for causing N.L.'s internal injuries and the second for failing to obtain medical care for N.L. Defendant Gonzalez claims that the State could not affirmatively prove that Defendant Gonzalez caused N.L.'s injuries. However, the State simply needed to prove that Defendant Gonzalez knowingly neglected N.L. on September 22-23, 2011, and the neglect resulted in serious bodily injury to N.L. See Sherman, 266 S.W.3d at 404.

The proof showed that N.L. was two years old at the time of the incident. Defendant Gonzalez stated that he acted as a "father figure" in the children's lives. Further, Defendant Gonzalez admitted during his September 27, 2011, interview that he struck N.L. once in the side, harder than normal, and Defendant Gonzalez testified at trial that he spanked N.L. on the morning of September 22, 2011. Further, Dr. Lowen testified that, based on N.L.'s injuries, he was struck more than once and with force equivalent to being hit or kicked by an adult or thrown against furniture with enough force to crush his intestines against his spine.

After Defendant Gonzalez struck N.L., he placed N.L. in Defendant Lopez's care and left the home. When he returned, N.L. was covered in vomit. Defendant Gonzalez admitted that he received updates about N.L.'s condition throughout the day and that he suggested taking N.L. to the hospital. However, he deferred to Defendant Lopez's decision not to take N.L. to the hospital. Dr. Lowen testified that N.L.'s condition would have worsened throughout the day, progressing to the point that any prudent caretaker would have sought medical attention. When N.L. was finally taken to the hospital, he was "near death" and had suffered serious abdominal and brain injuries.

Based on this proof, any rational jury could have found that Defendant Gonzalez owed a legal duty to N.L. Further, there was sufficient evidence for the jury to conclude that Defendant Gonzalez did not simply spank N.L., but knowingly struck N.L. with enough force to cause N.L.'s injuries and then left him in Defendant Lopez's care (the *mens rea* for Count 2). Further, the jury could conclude that Defendant Gonzalez knowingly declined to seek medical attention for N.L. (the *mens rea* for Count 3). Based on Dr. Lowen's testimony, the jury could determine that Defendant Gonzalez's conduct adversely affected N.L.'s health and welfare, resulting in serious bodily injury. Moreover, the evidence clearly showed that N.L. was under eighteen years old. Accordingly, the evidence was sufficient to support Defendant Gonzalez's convictions for aggravated child neglect.

Defendant Lopez claims that no reasonable jury could have found that she knowingly neglected N.L. by failing to obtain appropriate medical care for his injuries when she spent the day of September 22, 2011, trying to get N.L. to eat and drink, buying him medicine, calling medical providers for advice, and observing N.L.'s condition. Defendant Lopez also asserts that, based on the information she had available and her own observations, she would not have been aware that N.L. would suffer serious bodily injury as a result of her conduct.  However, as noted above, child neglect is a nature-of-conduct offense, not a result-of-conduct offense.  See Ducker, 27 S.W.3d at 897.  The statute did not require Defendant Lopez to know that N.L. would suffer serious bodily injury; it simply required that she knowingly declined to seek medical treatment for N.L.  See id.  In this case, Defendant Lopez owed a duty to N.L. as his mother.  See Sherman, 266 S.W.3d at 405.  She knew that N.L. was sick and that his stomach was "hard" but failed to take him to the doctor for medical treatment until he had collapsed.  At that point, N.L. had suffered serious abdominal and brain injuries.  Dr. Lowen stated that, while it would have been reasonable to treat N.L.'s symptoms as a virus initially, his condition would have gotten progressively worse as the day went on.  According to Dr. Lowen, eventually a prudent caregiver would have recognized that N.L. needed medical attention, regardless of that caregiver's medical knowledge or lack thereof.  She also stated that N.L.'s brain injury was a direct result of the delay in seeking medical care.  Based on this proof, any rational juror could conclude that N.L.'s condition had continued to worsen despite Defendant Lopez's efforts to treat it and that Defendant Lopez knowingly declined to seek medical attention for N.L.  Further, a rational juror could conclude that N.L. was under the age of eighteen and that Defendant Lopez's failure to seek medical attention adversely affected N.L.'s health and welfare, resulting in serious bodily injury.  Accordingly, the evidence is sufficient to support Defendant Lopez's conviction for aggravated child neglect.

*Sentencing*

Both Defendants also claim the trial court erred when setting the length of their sentences.  Although the statutory language continues to describe the applicable appellate review for sentencing decisions as de novo with a presumption of correctness, Tenn. Code Ann. § 40-35-401 (2010), the 2005 revisions to the Sentencing Act "effectively abrogated the de novo standard of appellate review."  State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012).  Following the 2005 amendments, sentences imposed within the statutory range that reflect a proper application of the purposes and principles of sentencing are reviewed under an abuse of discretion standard with a presumption of reasonableness.  Id.  A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles

involved in a particular case.'" State v. Shaffer, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999)). "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing determination." Bise, 380 S.W.3d at 709. Moreover, when a sentence is reviewed for an abuse of discretion with a presumption of reasonableness, this court may not disturb the sentence even if it had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. See Tenn. Code Ann. § 40-35-210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103 (2010).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2014); Bise, 380 S.W.3d at 706. However, "[m]ere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]." Bise, 380 S.W.3d at 705-06. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2010), Sentencing Comm'n Cmts.

### a. Defendant Gonzalez

Defendant Gonzalez argues that the trial court erred when it imposed a twenty-year sentence in Count 2 based on the finding that Defendant Gonzalez had a prior history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range. Defendant Gonzalez claims that the trial court's finding was based on his three prior misdemeanor convictions and hearsay testimony regarding domestic abuse in the home. He contends that the misdemeanor convictions should have been given "slight weight" and that the trial court's reliance on hearsay testimony was error because he was not allowed to confront A.L. about her allegations of abuse and domestic violence.

- 29 -

When setting Defendant Gonzalez's sentence, the trial court found that Defendant Gonzalez had a prior history of criminal convictions or criminal behavior, in additional to those necessary to establish the appropriate range. See Tenn. Code Ann. § 40-35-114(1) (2010). Specifically, the trial court stated, "The [c]ourt finds that there is evidence of previous criminal behavior, such as abuse and domestic violence on the part of [Defendant Gonzalez]; although the [c]ourt acknowledges that [Defendant Gonzalez] does not have any prior convictions other than those two driving violations and a criminal trespass conviction. In light of this history, the court will consider enhancement factor (1)." The court also noted that it was not placing "great weight" on hearsay evidence about abuse and domestic violence but instead relied on reports of abuse and domestic violence that were included in the presentence report. The trial court also found that the sentence should be enhanced based on the fact that Defendant Gonzalez abused a position of private trust. See Tenn. Code Ann. § 40-35-114(14) (2010).

Defendant Gonzalez claims that the trial court placed too much weight on his prior misdemeanor convictions. However, after the 2005 amendments to the Sentencing Act, the claim that a trial court improperly weighed the enhancement and mitigating factors is no longer a ground for appeal. Carter, 254 S.W.3d at 344. In any event, it does not appear from the record that the trial court placed much weight on Defendant Gonzalez's prior convictions at all. Instead, it focused on the reports that Defendant Gonzalez exhibited criminal behavior in the form of abuse and domestic violence. Defendant Gonzalez claims that the only proof of domestic violence was hearsay evidence of A.L.'s statements from Ms. Hendricks and the presentence report. However, Defendant Gonzalez overlooks the fact that Defendant Lopez testified at the sentencing hearing that there was domestic violence in the home; that Defendant Gonzalez was the primary aggressor; and that the children sometimes witnessed incidents of domestic violence. Further, in sentencing, the court may consider any evidence that it "deems to be trustworthy and probative," regardless of it admissibility under the rules of evidence. State v. Mackey, 553 S.W.2d 337, 344 (Tenn. 1977); State v. Hawk, 688 S.W.2d 467, 472 (Tenn. Crim. App. 1985); State v. Cadle, 634 S.W.2d 623, 627 (Tenn. Crim. App. 1982). Therefore, admission of A.L.'s statement through Ms. Hendricks and the presentence report was not error. Moreover, the trial court found that a second enhancement factor—that Defendant Gonzalez abused a position of private trust— applied in addition to his history of criminal conduct. The record also shows that the trial court considered the purposes and principles of sentencing and imposed a sentence within the applicable range. Therefore, we conclude that the trial court did not abuse its discretion in sentencing Defendant Gonzalez to twenty years in Count 2.

Defendant Gonzalez also claims that his rights under the Confrontation Clause were violated by introduction of hearsay evidence about A.L.'s allegations of abuse and domestic violence. However, this court has previously held that neither the federal nor

state constitutional right to confrontation applies to sentencing hearings. State v. William Edwin Harris, No. M2008-01685-CCA-R3-CD, 2009 WL 1871919, at *6 (Tenn. Crim. App. Jun. 20, 2009), perm. app. denied (Tenn. Nov. 30, 2009). Accordingly, Defendant Gonzalez is not entitled to relief on this issue.

### b. Defendant Lopez

Defendant Lopez argues that the trial court erred when it enhanced her sentence to seventeen years because it improperly considered an inapplicable enhancement factor, failed to give proper weight to mitigating factors, and improperly considered the principles and purposes of sentencing.

The trial court found that two enhancement factors applied to Defendant Lopez—namely that she had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the range and that she abused a position of private trust. See Tenn. Code Ann. § 40-35-114(1), (14) (2010). In regard to the first enhancement factor, the trial court acknowledged that Defendant Lopez had prior juvenile convictions but none of those convictions would have been felonies had she been charged as an adult. However, the trial court also noted that Defendant Lopez admitted in the presentence report to using cocaine and marijuana in the past. Regarding mitigating factors, the trial court noted that Defendant Lopez was less culpable than Defendant Gonzalez and that she had been victimized in the past. Further, the trial court found that the seventeen-year sentence was "the minimum sentence necessary to reflect the severity of the offense committed and to protect the public."

The record in this case shows that the trial court considered the principles and purposes of sentencing and imposed a sentence within the applicable range. Contrary to Defendant Lopez's claim, it does not appear that the trial court improperly applied the first enhancement factor when it found that she had a prior history of criminal convictions or criminal behavior. The trial court's order indicates that it did not rely on Defendant Lopez's juvenile record to support this enhancement factor. Instead, application of that enhancement factor was supported by Defendant Lopez's admission that she had used cocaine and marijuana in the past. See State v. Carico, 968 S.W.2d 280, 288 (Tenn. 1998) (trial court properly considered evidence of prior criminal behavior to enhance defendant's sentence even though defendant has no criminal conviction for such behavior). Further, the trial court found that a second enhancement factor applied to Defendant Lopez, providing further support for a longer sentence. Regarding Defendant Lopez's claim that the trial court failed to give proper weight to the mitigating factors, such claim is no longer a ground for appeal. Carter, 254 S.W.3d at 344. Finally, the trial court explicitly found that the seventeen-year sentence was "the minimum sentence necessary to reflect the severity of the offense committed and to protect the public." The

trial court did not abuse its discretion when imposing a seventeen-year sentence for Defendant Lopez's conviction.  Defendant Lopez is not entitled to relief.

## **Conclusion**

For the aforementioned reasons, the judgments of the trial court are affirmed.


_____
ROBERT L. HOLLOWAY, JR., JUDGE